## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

Yvette Cooper                                                    *
2301 North Calvert Street
Baltimore, Maryland 21218

vs.                                                  Case Number _____

Baltimore Gas and Electric Company                              *
2 Center Plaza
110 West Fayette Street
Baltimore, Maryland 21227,

  Serve on:

    Resident Agent
    Corporate Creations Network Inc.                    *
    #700
    2 Wisconsin Circle
    Chevy Chase, Maryland 20815,

and

Whelan Security Mid-Atlantic LLC
d/b/a/ GardaWorld Security Services
d/b/a GardaWorld                                                *
1710 Twinsprings Road
Baltimore, Maryland 21218
1699 S Hanley Road, Suite 350
Saint Louis , MO 63144,

  Serve on:

    Resident Agent
    The Corporation Trust Incorporated                  *
    2405 York Road
    Suite 201
    Lutherville, Timonium, Maryland 21093-2264

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT</u>

Yvette Cooper, Plaintiff, by and through her attorneys, Donald R. Huskey of the Law

Offices of Donald R. Huskey LLC and Governor E. Jackson III, of the Law Office of Governor

Jackson III, L.L.C. sues Baltimore Gas and Electric Company ("BGE") located at 2 Center Plaza

110 West Fayette Street, Baltimore, Maryland 21227, and Whelan Security Mid Atlantic LLC

d/b/a/ GardaWorld Security Services ("GardaWorld") 1699 S Hanley Road, Suite 350, Saint

Louis, Missouri 63144 and d/b/a/ GardaWorld, 1710 Twinsprings Road Baltimore, Maryland

21218 for her causes of action and states:

## PARTIES

1.  Yvette Cooper resides at 2301 North Calvert Street Baltimore, Maryland 21218. She was

employed by Defendant Whelan Security Mid Atlantic LLC  d/b/a GardaWorld Security

Services d/b/a/ GardaWorld (hereinafter "GardaWorld"), at 1710 Twinsprings Road Baltimore,

Maryland 21218 and Baltimore Gas and Electric Company (herein after "BGE"), located at 2

Center Plaza 110 West Fayette Street, Baltimore, Maryland, a subsidiary of Exelon, the nation's

largest energy delivery company serving more than 10 million customers at all times relevant.

2.  Plaintiff Cooper experienced sexual discrimination, gender discrimination, and retaliation

by the defendants' agents, servants, and employees, which caused her to become extremely

emotionally upset including crying, weight loss, embarrassment, loss of self-esteem and feeling

of worthlessness resulting in her mental health care and treatment, and exacerbation of

her pre-existing mental health condition of the following primary diagnosis: F41.1 300.02

General Anxiety disorder and F43.10.309 posttraumatic stress disorder on August 2, 2018 at

Change Health System Inc. The civil wrongs started on November 21, 2021, based on the acts

and omissions of her supervisor Tavon Roberts, and were ongoing and pervasive lasting until

August 26, 2022, a period of 9 months andresulting in Plaintiff's termination in a "rush to

judgment" as a pretextual joint decision of the defendants based on a single inconclusive test for use of a marijuana test. An inconclusive result indicates that the testing was not able to confirm whether drug residues were or were not present and may require repeat sample collection and testing. Plaintiff was fired by her abuser and not given a second test.

3.   Additionally, Plaintiff's termination resulted in lost wages, pay, and benefits. The acts and omissions were committed by the Defendants in furtherance of their business in the scope of their employment, agency, or as servants. Defendants are strictly liable for "quid pro quo" sexual harassment and retaliation by a supervisor of a subordinate. Defendant BGE had the benefit of in-house counsel in the C Suite downtown lead by General Counsel David Ralph.

4.   Plaintiff received mental care and treatment at Changing Health Care Systems, Inc., for her ongoing anxiety and depression on October 10, 2022 after her termination. During that visit the clinical note confirms that Plaintiff stated, "I have been depressed since getting fired from my job." Plaintiff received medication for major depression including Lexapro 10 MG Daily prescribed by Babatunde Olujori and Trazadone 50 MG QHS PRN. She will require expensive mental care and treatment for depression for the remainder of her life.

5.   Baltimore Gas and Electric Company's corporate office is located at 2 Center Plaza 110 West Fayette Street, Baltimore, Maryland 21227 and its resident agent is Corporate Creations Network, Inc., #700 2 Wisconsin 2 Wisconsin Circle Chevy Chase, Maryland 20815. BGE is Maryland's largest electricity provider with more than 1.2 million residential electric customers. The company is also the nation's first gas provider, with more than 690,000 gas customers. This Defendant recently consummated a conduit deal with Baltimore City lead by Mayor Brandon Scott. This defendant was the joint employer for Plaintiff and Tavon Roberts at all times relevant and participated in joint decisions regarding the performance of Plaintiff's duties, including but

3

not limited to decisions regarding scheduling, duties, and Plaintiff's termination. Further indicia

of this Defendant's liability under a joint employer theory are as follows:

(a) The kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision - As a security officer, Plaintiff's duties consisted of checking visitors in and out of BGE's corporate headquarters, printing and issuing identification badges for visitors at BGE's corporate headquarters, patrolling the interior and exterior of BGE's corporate headquarters

(b) The skill required in the particular occupation- As a security officer, Plaintiff was required to be physically fit, and have communication skills necessary to interact with members of the public, as well as the BGE employees engaged in their occupation inside of BGE's corporate headquarters.

(c) Whether the "employer" or the individual in question furnishes the equipment used and the place of work - Plaintiff's place of work was located inside of BGEs corporate headquarters, which is where the alleged harassment occurred. Defendant BGE also furnished the office and breakroom used by Plaintiff Cooper during her tenure

(d) The length of time during which the individual has worked -Plaintiff Cooper worked for the Defendants from November 19, 2021 until August 26, 2022.

(e) The method of payment, whether by time or by the job- Plaintiff Cooper was paid based on her time spent performing duties at the BGE corporate headquarters.

(f) The manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation - Plaintiff's termination occurred while she was on the premises at the BGE corporate headquarters.

(g) Whether the work is an integral part of the business of the "employer"-Plaintiff Cooper's work was integral to Defendant BGE as her sole responsibility was to protect the safety and well-being of BGE's corporate employees occupying BGE's corporate headquarters. To that end, on a daily basis, Plaintiff Cooper received work and post assignments, verbal direction, and required the granting of access by BGE employees Mike Gizzi (Building Supervisor), Ram Mahanand (BGE Supervisor of Security), and BGE's on-duty custodial supervisor.

Prior to Plaintiff's termination, a BGE corporate executive became aware of the violative

activities of Tavon Roberts based on a public statement Mr. Roberts made in the lobby of the

corporate headquarters in downtown Baltimore with numerous witnesses present after a

physical skirmish between women who were subject to Mr. Roberts predatory, sexually deviant,

and harassing practices. The executive's knowledge was later transmitted to the 14th floor which

is the "C-Suite" of BGE's corporate headquarters, and other corporate executives were alerted. Armed with this knowledge, Defendant BGE did nothing affirmatively to hasten the taking of any corrective action against Mr. Roberts, or his supervisors themselves, nor did Defendant BGE alert or otherwise notify co-Defendant GardaWorld of Mr. Roberts illegal and inappropriate behavior as Mr. Roberts retained his position of supervisory authority after the aforementioned incident in the lobby. Therefore, Defendant BGE's corporate executives are persons with knowledge and culpable.

6. At all times relevant to Plaintiff's tenure, Plaintiff Cooper held the reasonable belief that Defendant BGE was responsible for the safety and integrity of her working environment given that her daily routine duties could not be performed without the assistance of and frequent interaction with Defendant BGE's maintenance building manager, custodian supervisor, and specialist of safety.

7. Whelan Security Mid Atlantic LLC d/b/a GardaWorld Security Services of 1699 S. Hanley Road, Suite 350 Saint Louis , MO 63144 and located at GardaWorld 1710 Twinsprings Road Baltimore, Maryland 21218, (hereinafter "GardaWorld,") provided security services at Defendant BGE's corporate headquarters located at 2 Center Plaza 110 West Fayette Street Baltimore, Maryland 21227. Defendant GardaWorld at all times relevant was the joint employer of Plaintiff and her supervisor Jovan Roberts who engaged in the acts and omissions which proximately caused Plaintiff's economic and non-economic damages. Plaintiff Cooper was advised that she was terminated by her supervisor, Tavon Roberts who had over the course of months sexually harassed her in "quid pro quo" demand of sexual favors in exchange for awarding her overtime as his subordinate. Plaintiff consented for a period of time by engaging in sexual relations for overtime pay with her supervisor increasing her salary as much

5

as one third each pay period. When Plaintiff Cooper refused to provide continued sexual

relationship to Roberts in the military style organization,  he engaged in retaliation

resulting in Plaintiff's termination and resulting non-economic and economic damages

proximately caused by his conduct. All of Mr. Roberts' conduct occurred in the scope of his

employment as an agent, servant, and employee of the Defendants, therefore the Defendants are

vicariously liable for Mr. Roberts' conduct under the theory of *respondeat superior*.

8. Defendant GardaWorld is one of the largest privately owned integrated physical

security, cash management and risk management companies in the world serving clients in over

45 countries located in North America, Africa and the Middle East, including Fortune 500

companies and governments. This respondent's stated mission is "to make the world a safer

place by protecting [its] clients' people, assets and operations [and] to achieve this mission by

upholding the highest standards in all the jurisdictions in which [they] operate." GardaWold

holds itself out as a "value-driven organization." At all times relevant, Respondent GardaWorld

employed approximately 120,000 professionals and offered the services of physical security in a

myriad of facets, including security guards, mobile patrol security, event security, fire protection

and confined space monitoring, K9 security, police support services, executive protection, airport

security, and traffic control services.

9. Sexual harassment has plagued the environment at GardaWold prior to Complainant

Cooper's tenure, evidenced by the following article in the *Government Executiive* in 2015 by

Kellie Lunney entitled "Former Employee of Government Contractor Alleges Sexual

Harassment and Retaliation - Complaint against global security firm depicts Mad Men culture at

'guys with guns' company." The article stated as follows:

"A former female executive at a large government security contractor has filed a

6

lawsuit against the company claiming she was sexually harassed and then retaliated against by the firm's leadership when she reported the alleged incident.

Nicole Watson, former vice president of business process and integration at GardaWorld, filed a Feb. 4 complaint in the U.S. District Court for the Eastern District of Virginia claiming the president of one of the company's corporate entities made multiple lewd and sexually explicit comments during a job interview, forcibly kissed her, and told her that having sex with him was a prerequisite for getting ahead at the firm. The incident, which allegedly took place in 2011, occurred against the backdrop of pervasive gender and pay discrimination at the "male-dominated, guys-with-guns" corporation, according the the complaint.

"Nicole was subjected to disgusting sexual harassment at the same time she was being pushed out of her job solely because she is a woman. That, alone, is egregious enough," said Katherine Kimpel, partner at Sanford Heisler Kimpel, the firm representing Watson. "But the fact that the company proceeded to retaliate against her for failing to acquiesce to Company President [Chris] Jamroz's conduct is shameful. The defendants threatened to spend millions of dollars to 'ruin her' and to 'be pigs about it' shows their true colors. Whatever this corporation thinks it can get away with in other countries, this sort of behavior will not be tolerated in the U.S."

Garda, a global security and risk management company, is made up of GardaWorld International Protective Services, Garda Cash Logistics and Garda World Security Corporation. The defendants named in the case are Founding President and Chief Executive Officer Stephan Cretier, and President and COO Oliver Westmacott.

The company did not respond to multiple requests for comment about the case or the allegations.

According to the complaint, the trouble started in 2010 when Watson claims Garda began "pushing out female employees" in leadership positions as it started moving jobs from its U.S. headquarters in Virginia (where Watson worked) to Dubai in the United Arab Emirates. Watson said she expressed desire to move into a leadership role in Dubai, but was denied the opportunity despite a successful eight-year tenure at the company. The complaint also alleged that the company reduced Watson's bonuses, even though she and the company exceeded their individual targets in 2011, but did not do the same to men in similar positions. Top leadership also repeatedly gave her smaller pay increases than her male colleagues, and denied her an $85,000 bonus for fiscal 2012—after she reported she had been sexually harassed.

Watson eventually resigned from Garda in February 2012 because of the harassment, retaliation, and pay discrimination, and because she "felt repeatedly

victimized every time she sat in a room with male leaders at the company, knowing that the company permitted them to mistreat, harass, and assault their female colleagues with impunity, " the complaint stated.

Watson had met with Jamroz in 2011 at Westmacott's request, even though she was not interested in leaving GardaWorld for Garda Cash, the complaint said. According to the complaint, Jamroz scheduled a meeting in Columbus, Ohio, after business hours with Watson. During the interview, Jamroz allegedly told Watson she was "sexy" that she needed to "move closer" to him at the table, and then, when he discussed her possible taking on a regional sales manager role, commented that she "ought to have been creaming in [her] panties" over the opportunity. The complaint also alleged that Jamroz forcibly kissed and groped Watson during the meeting.

Kimpel said the case is like something out of the "Mad Men" era, referring to the popular AMC show depicting the chauvinist New York advertising industry in the 1960s. "It's particularly unusual," Kimpel said, in that it "shows disdain both for Nicole and our equal employment opportunity laws." (Garda World Security Corp. is headquartered in Montreal, Quebec, though its corporate entities have offices in the U.S.)

Watson is the only complainant so far in this case, Kimpel said, but in her experience, people tend to come forward when cases like this go public. When asked why Watson stayed at Garda as long as she did, particularly after the alleged incident with Jamroz, the attorney said Watson believed the company ultimately would support her. "The vast majority of women I represent do try and make it work. They think of litigation as a last resort. She [Watson] worked with them for a long time, and believed they would help her." That was why Watson went to the interview with Jamroz in the first place. That faith, Kimpel said, "is pretty common, probably more than the alternative."

10. At all times relevant to Complainant's tenure at GardaWold, this Defendant's agent's, servant's, and employees were bound by GardaWorld's "Code of Ethics", which stated in relevant part as follows:

"PURPOSE

This Code of ethics (the Code) serves to provide our employees with guidance on GardaWorld's business ethics. It is a set of guiding principles that is meant to serve as a standard of conduct that we expect all employees will commit to in making decisions in the scope of their work and their business dealings.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*To whom does this Code apply?*

8

- To GardaWold Security Corporation and its subsidiaries (collectively, GardaWorld or the Company) and to all part-time and full-time employees, without exception, all managers, executive officers and directors of every GardaWorld entity, business unit or division, regardless of their location.
- Other persons who may be identified from time to time in the Company's policies or guidelines.

***Is this all I need to know?***
- In addition to complying with this Code, you have an obligation to follow all Company policies and guidelines that apply to you.
- Above all, we expect and require that all employees respect the laws and regulations of the jurisdictions in which they operate.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"GardaWorld is committed to providing a work environment where our employees feel protected, valued and respected. All of us are expected to ensure our conduct complies with applicable Company policies and standards. As an employer, we are committed:
- Treating all employees with dignity and respect
- Providing fair wages, benefits, and reasonable working hours in compliance with industry standards, local laws and regulations
- Identifying and removing barriers to reasonable accommodation
- Examining compensation to promote pay equity and eliminate gender wage gaps
- Providing equal employment opportunities to designated groups, valuing an inclusive and diversified workforce
- Offering a workplace free of any discrimination, harassment, and violence, including psychological harassment, sexual harassment, abuse of power, threats, and intimidation
- Seeking out and working with qualified individuals regardless of race, religion, ethnicity, gender, national origins, age, sexual orientation, disability or any other charateristic unrelated to the ability to conduct work
- Supporting the collective bargaining process and employees' rights to exercise their freedom of association"

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"All employees must comply with the laws and regulations that apply to them and their work. Employees who fail to comply with the law expose both themselves and GardaWorld to legal action. Violations of this Code or of applicable laws may

lead to disciplinary measures that are proportional to the violation, up to and including termination of employment, in addition to sanctions imposed by law."

## JURISDICTION

11. This Court has subject matter jurisdiction over this dispute pursuant to Section 4-402 of the Courts and Judicial Proceedings Article of the Maryland Code Annotated. This Court may exercise personal jurisdiction over the named Defendants pursuant to Section 6-102 and 6-103 of the Courts and Judicial Articles of the Maryland Code Annotated. The money damages claimed are in excess of $35,000 the jurisdictional limit of this Court, and a jury trial is prayed. Furthermore, the United States Equal Employment Commission issued a "DETERMINATION AND NOTICE OF RIGHTS" letter and issued the right to sue on July 31, 2023 for Charge Number 531-2023-01584 which was a Charge of Discrimination filed by Plaintiff Cooper naming both of the instant Defendants as Respondents. This lawsuit is brought within 90 days, thereby fulfilling Plaintiff's duty to exhaust her administrative remedies.

## VENUE

12. Venue is proper in Baltimore City, Maryland pursuant to Section 6-201 of the Courts and Judicial Proceedings Article of the Maryland Code Annotated. The Plaintiff resides in Baltimore City, the events occurred in Baltimore City where BGE's corporate headquarters is located and the security services are staffed by Defendants BGE and GardaWorld in Baltimore City.

## FACTS COMMON TO ALL COUNTS

13.      Plaintiffs adopt paragraphs 1 through 12 as though fully restated verbatim herein.

14.      Plaintiff Cooper worked for Admiral Security and Baltimore Gas and Electric as a security guard from 2018-2019 at the Baltimore Gas and Electric headquarters located at 111

North Liberty and at 110 W. Fayette Street. While working there, Mr. Tavon Roberts was her supervisor.

15.    Admiral lost the contract in 2019 and was replaced by GardaWorld. As a result of the change in contracts, Plaintiff lost her job.

16.    Plaintiff remained in touch with Mr. Roberts as a business relationship. Plaintiff was not married. Mr. Roberts was unmarried.

17.    In November 2021, Plaintiff received communication from Tavon Roberts who had been hired by GardaWorld and promoted to the position of "Captain." He advised her that she was a hard worker, that she needed to return to work for him and that she would be getting paid $16.29, have life insurance, and her position would be as a supervisor, with the title of "Sergeant."

18.    During this conversation in November 2021, Mr. Roberts did not make any sexually inappropriate comments. Plaintiff told him that she was interested in the job and he said, 'thanks, I need some help." Plaintiff told Mr. Roberts that she would like to apply for the job, and filed an application with the Human Resources Department of GardaWorld located at 20 E. Timonium Road, Suite 101, Timonium, Maryland 21093. She was interviewed for 45 minutes over the phone shortly thereafter was immediately offered the job.

19.    Following her acceptance of the job offer, she received a phone call from the Human Resources Department of GardaWorld was advised to come in for a drug test and to receive her uniform. She did not have a criminal record and she assumed that GardaWorld did a background check. Mr. Roberts' start date was November 19, 2021. Plaintiff Cooper passed the drug test.

20.    Plaintiff Cooper then became a supervisor for GardaWorld and BGE. Her responsibilities at the corporate headquarters for BGE located at 111 North Liberty Street (east

building) included making badges for employees, taking badges, and ensuring that the building was safe. Her assigned location was the building where the BGE executives worked with hundreds of other BGE employees.

21.    Plaintiff Cooper had three employees whom she supervised. The first reporting employee was an  officer who sat at the desk next to Plaintiff where employees and visitors checked in. This officer was responsible for doing rounds at the building. The second reporting employee was an officer who advised Plaintiff Cooper when the Vice President of BGE was coming inside of the building. The third reporting employee was an an armed officer in front of the building to keep the building safe. Mr. Roberts was Plaintiff's direct supervisor, and Plaintiff Cooper reported directly to him.

22.    Plaintiff Cooper dealt with BGE employees on a daily basis. They included Bryan Sheets, who was Defendant BGE's Manager of Maintenance.  She had meetings with him regarding the operability of video cameras in the building, problems with elevators, custodial and maintenance-related issues, and Plaintiff Cooper was required to notify him in the event of emergencies. She also worked with Defendant BGE's safety specialist, Laura [last name unknown], and Mr. Ran [first name unknown].

23.  At all times relevant, four people reported to Mr. Roberts, including Plaintiff Cooper and another female, Ms. Jenkins. Plaintiff Cooper interacted with Captain Roberts on a daily basis. Each morning, she would report to him as to regarding the status of the building. Mr. Roberts would often advise her to check emails and determine if people might need to be escorted from the front desk to a floor in the building. The Executive Suite for BGE was on the 14th floor, and Plaintiff came into contact with them daily as the executives entered and left the building.

12

24.   The majority of Plaintiff's interactions with Mr. Roberts were in his office located in the rear of the east building. There were no cameras or windows in his office.  Mr. Roberts' office was on the same side of the building as the breakroom. The door to his office shut and automatically locked after she entered.  The primary reasons that she went to his office was to update him and to receive email requests.

25.   At the beginning of her tenure, Plaintiff Cooper was placed on a 90-day probationary period.  During that time, she did not have any problems or negative evaluations. After she had been working there for approximately thirty days, Plaintiff Cooper called from her desk and asked Captain Roberts about the 401(k) plan. Mr. Roberts told her to come to his office and speak with him.  She walked to Captain Robert's office to speak about the 401k benefit that GardaWorld offered. When she arrived, he spoke with her about how to sign up. The door shut and locked.

26.   As Plaintiff Cooper was leaving, and had her hand on the door to leave, Captain Roberts stunned her when he stated, "you really look good in your uniform." His tone made her feel uncomfortable, as his tone sounded as though he desired to have a sexually intimate relationship with Plaintiff Cooper. Plaintiff Cooper was in Captain Roberts' office for about 30 minutes on this occasion. Officer Roberts, who reported to Plaintiff Cooper, was at the desk which she was assigned to cover when Plaintiff Cooper was in the captain's office.

27.   Plaintiff Cooper, who worked the overnight shift from 11 p.m. until 7 a.m., told her co-worker Sergeant Wiley about the incident the next day. Plaintiff asked her, "Can you believe the Captain hit on me?!" Wiley responded, "What?!" Sergeant Wiley advised her to be careful as the captain was having a relationship with another female employee who reported to him named "Morrison."

13

28.    The relationship between Mr. Roberts and Morrison was an open secret. When Cooper was at Admiral Security, Roberts and Morrison would leave the premises and come back from the liquor store with a bottle. The two of them would go into the closet, and later come out smelling like alcohol. Captain Roberts did not have an office when he and Plaintiff Cooper were co-workers at Admiral Security.

29.    Plaintiff Cooper entering and leaving the office of Captain Roberts is, more likely than not, captured on the building's security cameras, the footage of which is preserved and can be viewed for weeks, months, and even years after the date in question.

30.    Plaintiff Cooper also told her sister Christine Cooper who lives at 2700 Reisterstown Road, Apartment 205, Maryland 21217 about what Mr. Roberts had done. She also told her adult daughter, Deja, who lives with her, about Mr. Roberts' lewd behavior

31.    On another occasion at the end of November 2021, Plaintiff Cooper went intoMr. Roberts' office to report that one of the security officers who reported to her was not performing as expected. After that discussion, with the door locked and closed, Captain Roberts walked toward her and squeezed her butt. He said, " you know I like you." Plaintiff Cooper, stunned, confused, and surprised, said, "I did not know that." When Mr. Roberts made this comment, Plaintiff Cooper had her hand on the door and was about to leave. Following this incident, Plaintiff Cooper was scared and ashamed to complain to any other employee of the Defendants as she was concerned she may lose her job given Mr. Roberts' supervisory position and her interim probationary status, and further felt that no corrective action would be taken if she complained given his known sexual relationship with employee Morrison. Indeed, Plaintiff Cooper believed Mr. Roberts to be in charge of security for the entire BGE building. Plaintiff Cooper was further shocked and confused as she never thought Mr. Roberts would engage in the

14

acts that he did. Plaintiff Cooper again told Sergeant Wiley about what occurred. Sergeant Wiley

replied to Plaintiff Cooper "Oh no. What are you going to do?" Plaintiff Cooper, based on her

fear and feeling of intimidation, had no response.

32.    Soon thereafter, Plaintiff Cooper and Mr. Roberts were talking and she asked him if

he was romantically involved.  They agreed to meet outside of the job and ended up going to his

house where they engaged in intercourse. During their meeting, he admitted that he and Morrison

were good friends. Following this meeting, Plaintiff Cooper told Sergeant Wiley that she had

slept with Captain Roberts. Sergeant Wiley responded that the Plaintiff needed to be careful

because, "he also is talking to Morrison." At all times relevant, Mr. Roberts commanded and

controlled company size units.

33.    In February 2022, Captain Roberts asked Plaintiff Cooper to bring an employee

sign-in book to his office. The two of them were alone with the door shut and locked. They

talked briefly about how to handle an employee that was not meeting expectations and then Mr.

Roberts told Plaintiff Cooper to get out of the seat and come to him. Plaintiff Cooper obliged and

when Plaintiff Cooper approached Mr. Roberts, he kissed her. They then had sexual relations

inside of Mr. Roberts' office. The incident lasted approximately 20 minutes.  An employee who

reported to Plaintiff Cooper covered for responsibilities at the lobby desk during this time.

34.    On another occasion at the end of February 2022, Captain Roberts summoned

Plaintiff Cooper to his office, closed and locked the door, and forcibly pushed her down on her

knees with the intent of having Plaintiff Cooper perform fellatio. Mr. Roberts then ejaculated

in her mouth and on her face, and then told Plaintiff to clean herself up. This incident lasted

approximately 20-25 minutes. Following this incident, Mr. Roberts told the Plaintiff, "if you

keep this up,  you will not have to worry about receiving overtime." With the lure of receiving

15

additional pay in exchange for providing sexual favors and intimidated by Mr. Roberts' apparent

position of authority, Plaintiff Cooper did not inform anyone of this incident. True to Mr.

Robert's "quid pro quo" arrangement,  Plaintiff Cooper's check had been $857 every two weeks

and moved up to between $1100 and $1400 every 2 weeks after she started performing sexual

favors for him. Plaintiff Cooper retained the check stubs which indicate these increases.

35.    Mr. Roberts' harassing behavior continued in March 2022 . Specifically,  once or

twice a week, Captain Roberts would demand that Plaintiff Cooper perform sexual acts on him in

his office during her shift. During this timeframe, Plaintiff Cooper learned out that Mr. Roberts

was continuing to have sexual relations with Morrison and another officer named "Goings" who

reported to him. Captain Roberts even told Plaintiff Cooper that he "needed to try her [Goings]

too." After making this comment to Plaintiff Cooper, Plaintiff Cooper would observe Goings in

Mr. Roberts' office for two and three hours at a time with the door closed.

36.    In April and May 2022, Plaintiff continued to have intercourse two to three times

per week with Mr. Roberts  in exchange for the continued increase in overtime pay. The sessions

of intercourse during this time consisted of the physically humiliating act of Mr. Roberts

ejaculating in Plaintiff Cooper's face and demanding her to "clean it up" in his presence, and

being "submissive" to Mr. Roberts' lewd and aggressive demands to engage in various

humiliating sexual positions for his pleasure. Plaintiff considered Mr. Roberts' behavior and

demeanor during these sessions to be abusive, physically and mentally, causing her to feel

anxiety and depression during the time remaining on her shift on the dates that the intercourse

occurred, and further into the evening before having to return again to work. In a willful attempt

to entice Plaintiff Cooper to continue the inappropriate and illegal relationship, Mr. Roberts gave

Plaintiff a gift card worth $50.  During this time, Plaintiff had the impression that Mr. Roberts

16

was continuing to have an ongoing sexual relationship with Morrison based on Plaintiff's and

Morrison's limited communication with the Plaintiff during her shift.

37.    At the end of May 2022, Plaintiff - disgusted with the 'quid pro quo' arrangement

with Mr. Roberts– told Captain Roberts that she was not going to continue having intercourse

with him.

38.    Thereafter, Captain Roberts stopped giving Plaintiff Cooper additional overtime

when she stopped having sex with him. However, he continued to give overtime opportunities to

the female employees who continued to have sex with him. It was clear to Plaintiff Cooper that

Mr. Roberts wanted to control her and force her to have sex with him as a condition to receive

overtime. Also, Mr. Roberts' behavior and attitude towards Plaintiff Cooper at the workplace

changed drastically, causing the Plaintiff to (a) alter her method of communicating with Mr.

Roberts and only doing so when there were witnesses present, (b) physically position herself

around the office so as to not be in proximity to Mr. Roberts and/or his office, (c) refrain from

engaging in a management style with respect to her reporting employees so as to not have to

discuss any management-related issues with Mr. Roberts, (d) refrain from taking frequent

bathroom breaks and refraining from using the break room so as to not be in proximity to Mr.

Roberts and/or his office, (e) refrain from communicating with other female employees who

reported to Mr. Roberts out of fear of retaliation by Mr. Roberts, and (f) experience nervousness,

shame, and anxiety before, during, and after her shifts out of fear of losing her job or being the

recipient of some form of retaliation by Mr. Roberts. These changes in her behavior lasted from

May 2022 until her termination in August 2022 during every one of her shifts. Such changes in

her behavior caused her to have feelings of severe anxiety and depression on a nightly basis

during this time causing her to have trouble sleeping and difficulty communicating with her
peers at work due to her fear of being the recipient of some form of retaliation by Mr. Roberts.

39.     In early August 2022, there was an incident involving a female officer, Officer
Johnson, who worked for Captain Roberts and was fired.  When Officer Johnson was fired,
Sergeant Wiley, upset at what she perceived to be Officer Johnson's unwarranted termination,
flipped a chair and exclaimed out loud in the lobby of BGE's headquarters that Captain Roberts
was sleeping with Roberts. A BGE employee who worked on the 14th floor was aware of the
comment and informed other executives on the 14th Floor of the nature of Sergeant Wiley's
exclamation. Upon receipt of this information, a Vice President of BGE asked Plaintiff Cooper
and other employees "If everything was o.k.?" and then stated "I heard what happened. I know
everything." Another security officer, Officer Bell, was also present when the Vice President
came down and had the conversation with those gathered, including Plaintiff Cooper. The Vice
President was a black male, low cut hair, 40-45, 180 or 190, 5"7. He was dressed in a polo shirt
and khaki pants. He came in and out of the building daily.

40.     Following Sergeant Wiley's outburst, Captain Roberts then advised Cooper only
speak to him and to not talk to any other employee about what was going on.

41.     In late August 2022, Plaintiff Cooper was given a drug test for marijuana. Cooper
was told by Captain Roberts that the test was inconclusive and faulty as there was not a sufficient
amount of saliva to make a violative determination. However, Mr. Roberts later informed
Plaintiff Cooper on August 26, 2022, that "Jason and Major Engle are using the drug test as
positive." Mr. Roberts then told her that she was fired by the Defendants. Plaintiff Cooper left
the job that day. The last date she worked was August 26, 2022, until 10:00 a.m. when she was
fired.

18

42.    Major Engle contacted Cooper on August 29, 2022. and asked her if she was resigning.  Plaintiff Cooper told him that Captain Roberts had told her that she was fired. Major Engle did not say anything in response.  Plaintiff Cooper then said, "Since I am fired I want to tell you that he was swinging his penis around and I am sending you a text message." Plaintiff Cooper then sent a text message to Major Engle wherein Mr. Roberts asked Plaintiff to "ride his penis." After she sent Engle the text message from Roberts asking me to come into the office and  "ride his penis," Mr. Roberts was fired the next day.

43.    During the first week of September 2022, Plaintiff Cooper called the Human Resources at GardaWorld and left messages indicating that she wanted to speak to someone about her job however her call was never returned. Plaintiff Cooper called again on Monday, September 12, 2022, however her call, again, was never returned. Plaintiff Cooper was never given an exit interview or provided written notice of the basis for my termination.

44.    After Plaintiff Cooper's termination, Mr. Roberts continued to send her text messages. Mr. Roberts texted her on September 2, 2022 at 5:11, stating  "go to the clinic and get checked please. I do not care about the bullshit."  He sent another text message on September 9, 2022 again telling Plaintiff Cooper that she should "go to the clinic.."

45.    Prior to Plaintiff Cooper's termination, she suffered from clinically diagnosed post traumatic stress disorder. Specifically, on August 2, 2018, practitioners at Change Health System, Inc. diagnosed her with the following: F41.1 300.02 General Anxiety disorder and F43.10.309 posttraumatic stress disorder. Since her termination, Plaintiff Cooper suffered from a significant increase of clinical signs of depression present on a daily basis including mood swings, irritability extended social isolation, sleeplessness, heightened anxiety, guilt, loneliness, weight loss, embarrassment, and recurrent flashbacks of Mr. Roberts physically humiliating acts

19

that he made Plaintiff Cooper perform on the Defendants' premises. She was also distressed given her potential exposure to a sexually transmitted disease.

46.    To date, Plaintiff Cooper continues to battle her increased signs of depression on the basis that she believes that she lost her job because she refused to continue to have sex with her boss. To date, she has never been requested by the Defendants to provide any written statement or participate in any investigation into the lewd acts of Mr. Roberts. She was also never provided a copy of the results of the drug test which was the alleged basis of her termination. Even during the course of her tenure, Plaintiff Cooper was never provided any training on the illegal and inappropriate nature of sexual harassment, nor was she ever informed about any method to report violative conduct such as sexual harassment involving her supervisor as the culprit.

47.    She is currently receiving mental health care and treatment by a psychiatrist for depression at Changing Health Systems. After her termination, Plaintiff filed for unemployment and began searching for gainful employment.

48.    During her tenure, Plaintiff Cooper and Robertson transmitted the following text messages evidencing the inappropriate nature of Mr. Roberts' actions as a supervisor:

**Nov 27, 2021, 8:12 PM**

Audio Call from Roberts 11 minutes

**November 28, 2021, 7:15 AM**

Sender Roberts "Can I pick u up today"

**November 28, 2021, 7:40 AM**

Response Cooper "Yes"

**November 28, 2021, 3:57 PM**

Sender Roberts "I want to try what I was saying on u so bad rite now"

"My feet on fire rite now how I'm thinking in da church"

Response Cooper "You are going straight to hell."

**November 29th, 2021, 9;51 AM**

Sender Roberts "But I do have to. Rite you on when you get here it will be on my desk

**November 29, 2021, 10:26 AM**

Response Cooper "Huh"

Sender Roberts " I just need to my pen in your ink"

12:23

Sender Roberts "What u doing…"

Response Cooper "Walking home"

Sender Roberts "Can I come get you……"

Response Cooper " I have a client at 7"

Sender Roberts "After I can take u home in da morning I need to feel that pussy juicing on this

dick…Got frustration to take out … U will orgasm better than vid u sent"

**December 03, 2021 7:38 PM**

Sender Roberts "What if I said I just wanted to hold ur ass while I slept in beast mode…"

**December 03, 2021, 8:20 PM**

Cooper sender "U hungry"

Roberts response, "I had sum cheeks last nite baby I'm still full…

**Dec 04, 2021, 11:12 AM**

Sender Roberts "Putting you on my lips…

Response Cooper " U good. I'm here waiting on"

Response Roberts "Real soon baby"

**December 15, 2021 12:33 PM**

Response Cooper "I'm just seeing this"

Sender Roberts "I want suck on them soft pussy lips rite now"

Response Cooper "U could. Come over for lunch. I can be your lunch"

Response Roberts "I wish I could leave rite now"

"By the time it is done on 14 you will probably be on ur way"

Guess I'm going to have to get stick my tongue deep soon as I see u"

**December 16, 2021, 11:00 AM**

Sender Roberts " I'm need u to spread them cheeks for me win you get back"

**Jan 06, 2022, 1:41 PM**

Sender Roberts "I'm about up there and get my old chair and bring it back to my office that way you. Can ride me"

**Jan 5, 2022, 4:58 PM**

Cooper Sender "So u don't need me for tomorrow"

Roberts Response "Why not baby"

Cooper Response " I just need to keep my cookies to myself"

"I don't like sharing"

Roberts  Response "What u talking about ....."

**Jan 06, 2022, 11:54 AM**

Roberts sender "Take the. Small conference room on the HR side and nap out"

Cooper response "You are the best"

Roberts response "I knowwwwwwww."

"Taste you soon… Have a good day"

22

**Feb 03, 2022, 10:10 AM**

Roberts sender "Stop playing with that pussy......

Cooper Response "I can wait until I get home"

Roberts sender "Make me a vid... baby"

**Feb 11, 2022, 1:17 PM**

Sender Roberts "What...for me....baby im a tickle your belly my tongue going to be so deep up in that pretty pussy"

**March 29, 2022, 1:33 PM**

Sender Roberts "Just tell me put the towel under my ass.......Please"

**April 08, 2022, 9:31 AM**

Response Roberts "My ot is missing"

"Hit me when you get a chance"
"Thanks"

**June 25, 2022, 11:16 AM**

Sender Roberts "Can he have a kiss"

Cooper Response "Can he have a kiss"

Sender Roberts " Yep yep"

**June 28, 2022, 8:29 PM**

Sender Roberts "She work amazon during the day she said she going quit them"

Cooper Response "What you. say to Morrison"

"To get her to say something to me"

"Call me"

" I'm glad she put her personal feelings aside and learned how to be personal"

**June 02, 11:00 AM**

23

Cooper Sender " You already know what it is"

" U asked for some pussy but I have to decline as long as u fucking Morrison I can't be involved"

Wed, Aug 31, 2022 7:42 PM

Roberts sender "Dirty"

Thur, Sep 1, 2022 1:35 PM

Roberts sender "Um hum"

Fri, Sept 9, 2022 5:11 AM

Roberts sender "Don't. care about the past bullshit 100....Go to the clinic and get checked....PLEASE"

49. Plaintiff's termination proximately caused her extraordinary past, current, and future non-economic pain and suffering which is severe and ongoing, and also caused Plaintiff economic injury, including lost wages, pay, and benefits. Plaintiff received mental care and treatment at Changing Health Care Systems, Inc for her ongoing anxiety and depression on October 10, 2022, and as stated in the clinical note, reported "I have been depressed since getting fired from my job." Based on her treatment, Plaintiff received a prescription from by Babatunde Olujori, PMHNP  for medications to alleviate her symptoms of major depression including Lexapro (10 MG Daily) and Trazadone (50 MG QHS PRN). Her mental condition continues to worsen as Mr. Roberts, since the date of his termination, has texted her several verbal insults and on occasion, has texted several sexually graphic photos, including one of an unidentified erect penis.

24

<u>COUNT I</u>
<u>VIOLATION OF MARYLAND STATE GOVERNMENT CODE §20-606(a)(1)(i)-</u>
<u>DISCRIMINATION ON THE BASIS OF SEX</u>

50.    Plaintiff adopts paragraphs 1 through 49 as though fully restated verbatim herein.

51.    The Defendants' conduct as alleged herein constitutes discrimination on the basis of Plaintiff's sex in violation of Sections 20-606, 20-607, 20-1013(b) of the Maryland Annotated Code, State Government Article. Specifically, Plaintiff Cooper is a female, a member of a protected class. On August 26, 2022, she suffered an adverse employment action by being terminated, and this adverse employment action gives rise to an inference of discrimination based on the incidents of discriminatory treatment experienced by Plaintiff Cooper at the hands of her direct supervisor, Mr. Roberts, and being treated differently from and less preferably than similarly situated male employees who did not have to repeatedly succumb to Mr. Roberts' demeaning, lewd, and sexually explicit and illegal behavior.

52.    Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees resulted in disparate treatment affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, perpetuated the disparate treatment affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

53.    As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from

these Defendants under Section 1009 of the Maryland Annotated Code, State Government
Article.

54.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered
and continues to suffer impairment to her name and reputation, humiliation, embarrassment,
emotional and physical distress, and mental anguish including, but not limited to, exacerbation of
her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress
disorder.

55.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld
and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages,
ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court
deems appropriate in the interests of justice.

**COUNT II**
**VIOLATION OF MARYLAND STATE GOVERNMENT CODE §20-606(a)(1)(i) and**
**20-611-*QUID PRO QUO* HARASSMENT**

56.    Plaintiff adopts paragraphs 1 through 55 as though fully restated verbatim herein.

57.    The Defendants' conduct as alleged herein constitutes *quid pro quo* workplace
harassment in violation of Sections 20-606 and 20-611 of the Maryland Annotated Code, State
Government Article. Specifically, Plaintiff Cooper, a female, was under the direct supervision of
Mr. Roberts, a male, who used his influence and power to increase Plaintiff's compensation and
in direct exchange for sexual intercourse with Plaintiff Cooper. Demanding and obtaining sexual
favors as a condition of employment is a quintessential example of *quid pro quo* harassment. An
employer is liable for the acts or omissions toward an employee by an individual who directs,
supervises, or evaluates the work activities of the employee. Here, Mr. Roberts supervised and
evaluated the work of Plaintiff Cooper during the time the harassment occurred, therefore, the

Defendants are liable. Furthermore, the harassment was objectively severe and pervasive as it occurred on such a frequent basis, was physically humiliating in nature, and unreasonably interfered with Plaintiff's performance of her duties both during the *quid pro quo* harassment and after Plaintiff Cooper began rejecting Mr. Roberts' demands for sex inside of the workplace; thus, a reasonable juror could find that the harassment was so severe or pervasive as to alter the conditions of Plaintiff's employment and create an abusive or hostile atmosphere. The harassment was subjectively severe and pervasive as Plaintiff Cooper considered Mr. Roberts' behavior and demeanor during sessions of intercourse at work to be abusive, physically and mentally, causing her to feel anxiety and depression during the time remaining on her shift on the dates that the intercourse occurred, and further into the evening before having to return again to work.

58.    Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees have resulted in *quid pro quo* harassment affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, have perpetuated the *quid pro quo* harassment affecting Plaintiff Cooper through conduct that has been intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

59.    As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from

27

these Defendants under Section 1009 of the Maryland Annotated Code, State Government Article.

60.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

61.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

## COUNT III
## VIOLATION OF MARYLAND STATE GOVERNMENT CODE §20-606(f)-RETALIATION

62.    Plaintiff adopts paragraphs 1 through 61 as though fully restated verbatim herein.

63.    The Defendants' conduct as alleged herein constitutes retaliation in violation of Sections 20-606(f) of the Maryland Annotated Code, State Government Article. Specifically, in May 2022, Plaintiff Cooper opposed Mr. Roberts' demands for sex in exchange for a sustained increase in compensation, thereby opposing the harassing practice which is prohibited by the Maryland State Government Code. Within ninety days following her opposition, she suffered an adverse employment action when she was terminated in August 2022. There was a causal connection between her opposition and her termination given that her supervisor and the offender, Mr. Roberts, had the authority to hire, fire, and discipline employees and exerted his

influence over the decision to terminate Plaintiff Cooper based on the pretext of a "failed drug

test" despite Mr. Roberts' own admission to the Plaintiff of the contrary results of the test.

64.     Furthermore, Defendants, and the policies, practices, and/or procedures enacted

and engaged in by their agents, servants, and employees resulted in retaliation affecting Plaintiff

Cooper with respect to the terms and conditions of her employment. Defendants, by and through

their agents, servants, and employees, perpetuated the retaliation affecting Plaintiff Cooper

through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in

callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

65.     As a proximate cause and result of Defendants' conduct alleged in this Complaint,

Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost

back pay, lost benefits, loss of seniority status, and other economic and non-economic damages.

Plaintiff is entitled to recover such monetary and compensatory relief and other damages from

these Defendants under Section 1009 of the Maryland Annotated Code, State Government

Article.

66.     As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered

and continues to suffer impairment to her name and reputation, humiliation, embarrassment,

emotional and physical distress, and mental anguish including, but not limited to, exacerbation of

her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress

disorder.

67.     WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld

and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages,

ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court

deems appropriate in the interests of justice.

## COUNT IV
## DISPARATE TREATMENT ON THE BASIS OF SEX IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e ET SEQ.

68.     Plaintiff adopts paragraphs 1 through 67 as though fully restated verbatim herein.

69.     Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer… to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. 2000e-2(a)(1).The phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.

70.     The Defendants' conduct as alleged herein constitutes disparate treatment on the basis of sex. Specifically, Plaintiff Cooper is a woman, a member of a protected class. Plaintiff also had satisfactory work performance until the time she suffered an adverse employment action, her termination in August 2022. Based upon Plaintiff's experience, information, and belief, she was treated differently from similarly situated male employees as male employees did not have to submit to Mr. Roberts' demand for sexual favors in exchange for overtime compensation. Doing so for the Plaintiff adversely affected the terms and conditions of her employment during the time that the disparate treatment was occuring, and after Plaintiff Cooper vocally opposed the disparate treatment engaged in by Mr. Roberts.

71.     Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees resulted in disparate treatment affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, perpetuated the disparate treatment affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless,

30

and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

72.    As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from these Defendants under Title VII of the Civil Rights Act of 1964.

73.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

74.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

### COUNT V
### *QUID PRO QUO* HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e ET SEQ.

75.    Plaintiff adopts paragraphs 1 through 74 as though fully restated verbatim herein.

76.    Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer… to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. 2000e-2(a)(1).The phrase "terms, conditions, or

31

privileges of employment" evinces a congressional intent to strike at the entire spectrum of

disparate treatment of men and women in employment. The employer is strictly liable for the

harassment if committed by a supervisor.

77.     The Defendants' conduct as alleged herein constitutes *quid pro quo* workplace

harassment in violation of Title VII. Specifically, Plaintiff Cooper, a female, was under the direct

supervision of Mr. Roberts, a male, who used his influence and power to increase Plaintiff's

compensation and in direct exchange for sexual intercourse with Plaintiff Cooper. Demanding

and obtaining sexual favors as a condition of employment is a quintessential example of *quid pro*

*quo* harassment. Here, Mr. Roberts supervised and evaluated the work of Plaintiff Cooper during

the time the harassment occurred, therefore, the Defendants are liable. Furthermore, the

harassment was objectively severe and pervasive as it occurred on such a frequent basis, was

physically humiliating in nature, and unreasonably interfered with Plaintiff's performance of her

duties both during the *quid pro quo* harassment and after Plaintiff Cooper began rejecting Mr.

Roberts' demands for sex inside of the workplace; thus, a reasonable juror could find that the

harassment was so severe or pervasive as to alter the conditions of Plaintiff's employment and

create an abusive or hostile atmosphere. The harassment was subjectively severe and pervasive

as Plaintiff Cooper considered Mr. Roberts' behavior and demeanor during sessions of

intercourse at work to be abusive, physically and mentally, causing her to feel anxiety and

depression during the time remaining on her shift on the dates that the intercourse occurred, and

further into the evening before having to return again to work.

78.     Furthermore, Defendants, and the policies, practices, and/or procedures enacted

and engaged in by their agents, servants, and employees resulted in *quid pro quo* harassment

affecting Plaintiff Cooper with respect to the terms and conditions of her employment.

Defendants, by and through their agents, servants, and employees, perpetuated the *quid pro quo* harassment affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

79.    As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from these Defendants under Title VII.

80.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

81.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

## COUNT VI
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e ET SEQ.

82.    Plaintiff adopts paragraphs 1 through 81 as though fully restated verbatim herein.

83.    The conduct of the Defendants' agent, servant, and employee, Mr. Roberts constituted a hostile work environment in violation of Title VII as the harassing conduct was

unwelcome, based on Plaintiff's sex as a female, and sufficiently severe and pervasive to alter

the conditions of Plaintiff's employment, and created an abusive working environment which

was imputable to the Defendants. Specifically, beginning in November 2021 until May 2022,

Plaintiff Cooper was subjected to sexual assault, both verbally and physically, on a weekly basis,

ranging from unwanted touches to her body to physically demeaning intercourse. These

advances and acts interfered with Plaintiff's performance by causing her to have to leave her post

unattended for hours at a time, alter her patrol routine and, following her opposition to the

advances, being subjected to the hostile and adversarial change in Mr. Roberts' behavior and

attitude towards Plaintiff Cooper, causing the Plaintiff to (a) alter her method of communicating

with Mr. Roberts and only doing so when there were witnesses present, (b) physically position

herself around the office so as to not be in proximity to Mr. Roberts and/or his office, (c) refrain

from engaging in a management style with respect to her reporting employees so as to not have

to discuss any management-related issues with Mr. Roberts, (d) refrain from taking frequent

bathroom breaks and refraining from using the break room so as to not be in proximity to Mr.

Roberts and/or his office,  (e) refrain from communicating with other female employees who

reported to Mr. Roberts out of fear of retaliation by Mr. Roberts, and (f) experience nervousness,

shame, and anxiety before, during, and after her shifts out of fear of losing her job or being the

recipient of some form of retaliation by Mr. Roberts. These changes in her behavior lasted from

May 2022 until her termination in August 2022 during every one of her shifts during the

workweek. Such changes in her behavior caused her to have feelings of severe anxiety and

depression on a nightly basis during this time causing her to have trouble sleeping and difficulty

communicating with her peers at work due to her fear of being the recipient of some form of

retaliation by Mr. Roberts. Objectively, a reasonable juror could find that the harassment was so

severe or pervasive as to alter the conditions of Plaintiff's employment and create an abusive or hostile atmosphere.

84.    Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees resulted in harassment affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, perpetuated the harassment affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

85.    As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from these Defendants under Title VII.

86.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

87.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

## COUNT VII
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL
## RIGHTS ACT OF 1964, 42 U.S.C. 2000e ET SEQ.

88.    Plaintiff adopts paragraphs 1 through 87 as though fully restated verbatim herein.

89.    The Defendants' conduct as alleged herein constituted retaliation in violation of

Title VII as the Plaintiff opposed conduct in violation of Title VII, suffered an adverse

employment action at the hands of her employer, and a causal link exists between her opposition

and termination approximately ninety days thereafter. There was a causal connection between

her opposition and her termination given that her supervisor and the offender, Mr. Roberts, had

the authority to hire, fire, and discipline employees and exerted his influence over the decision to

terminate Plaintiff Cooper based on the pretext of a "failed drug test" despite Mr. Roberts' own

admission to the Plaintiff of the contrary results of the test.

90.    Furthermore, Defendants, and the policies, practices, and/or procedures enacted

and engaged in by their agents, servants, and employees resulted in retaliation affecting Plaintiff

Cooper with respect to the terms and conditions of her employment. Defendants, by and through

their agents, servants, and employees, perpetuated the retaliation affecting Plaintiff Cooper

through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in

callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

91.    As a proximate cause and result of Defendants' conduct alleged in this Complaint,

Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost

back pay, lost benefits, loss of seniority status, and other economic and non-economic damages.

Plaintiff is entitled to recover such monetary and compensatory relief and other damages from

these Defendants under Title VII.

36

92.    As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

93.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

## COUNT VIII
## WRONGFUL TERMINATION

94.    Plaintiff adopts paragraphs 1 through 87 as though fully restated verbatim herein.

95.    The Defendants' conduct as alleged herein constituted a wrongful termination in violation of Title VII. Specifically, Plaintiff Cooper was discharged, her dismissal violated a clear mandate of public policy, and there is a nexus between the Defendants and their decision to fire Plaintiff Cooper. Plaintiff's dismissal violated a clear mandate of public policy because it was based upon the inconclusive results of a saliva test which was given to her to evaluate her for drug use. Plaintiff Cooper will produce testimony from Glenda Flemister, M.D. who is board certified in critical care, internal medicine, and pulmonology, former Director of Medicine for Aetna of the Midwest, will testify that a saliva test is worthless in evaluating for drug use, and that a blood sample test is the standard within the community for determining conclusively whether an employee has recently used drugs.

96.    Additionally, Defendants are also liable for Plaintiff's wrongful termination given that she was discharged for refusing to continue to commit an unlawful and wrongful act,

37

specifically, engaging in sexual relations in exchange for overtime compensation which is a violation of Title VII. Prior to Plaintiff's discharge, her performance met her employers' legitimate expectations. Given the time period of approximately ninety days which elapsed between the Plaintiff's refusal to commit an unlawful act and her termination, a causal nexus exists between her discharge and Plaintiff's opposition.

97.     Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees resulted in wrongful termination affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, perpetuated the wrongful termination affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

98.     As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from these Defendants under Title VII.

99.     As a further result of Defendants' unlawful conduct, Plaintiff Cooper has suffered and continues to suffer impairment to her name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish including, but not limited to, exacerbation of her pre-existing diagnosed mental conditions of general anxiety and post traumatic stress disorder.

100.    WHEREFORE, Plaintiff Cooper hereby claims against Defendants GardaWorld and BGE, jointly and severally, one million dollars ($1,000,000.00) in compensatory damages, ten million dollars ($10,000,000.00) in punitive damages, and any other such relief as this Court deems appropriate in the interests of justice.

Respectfully submitted,

Donald R. Huskey
CPF NO. 0712010286
Law Offices of Donald R. Huskey LLC
9419 Lyonswood Drive
Owings Mills, Maryland 21117
443-929-1001
dr.huskey@gmail.com

Law Office of Governor Jackson,III, LLC
400 E. Joppa Road,
Suite 50
Towson, Maryland 21286
(410) 528-5150
(410) 528-1055 (f)
gjackson@governorjacksonlaw.com
CPF #0412140364

*Attorneys for Plaintiff*

## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

Yvette Cooper                                   *
2301 North Calvert Street
Baltimore, Maryland 21218,
                                                *

vs.                                             Case Number _____

Baltimore Gas and Electric Company, et al.,     *
2 Center Plaza
110 West Fayette Street
Baltimore, Maryland 21227
*************************************************************************************

### JURY TRIAL PRAYER

Plaintiffs respectfully pray this action be tried before a jury.

                         Respectfully submitted,

                         Donald R. Huskey
                         CPF NO. 0712010286
                         Law Offices of Donald R. Huskey LLC
                         9419 Lyonswood Drive
                         Owings Mills, Maryland 21117
                         443-929-1001
                         dr.huskey@gmail.com

                         Law Office of Governor Jackson,III, LLC
                         400 E. Joppa Road,
                         Suite 50
                         Towson, Maryland 21286
                         (410) 528-5150
                         (410) 528-1055 (f)
                         gjackson@governorjacksonlaw.com
                         CPF #0412140364

                         *Attorneys for Plaintiffs*

40