## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

YVETTE COOPER,

        *Plaintiff,*

    v.

BALTIMORE GAS AND ELECTRIC
COMPANY, *et al.*,

        *Defendants.*

Civil No. 1:23-cv-03116-JRR

## MEMORANDUM OPINION

Pending before the court are Defendant Whelan Security Mid-Atlantic LLC d/b/a GardaWorld Security Services' ("GardaWorld") Motion to Dismiss Plaintiff's Complaint (ECF No. 13; the "GardaWorld Motion") and Defendant Baltimore Gas and Electric Company's ("BGE") Partial Motion to Dismiss.  (ECF No. 12; the "BGE Motion").  The court has reviewed all papers.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

## I.    BACKGROUND[1]

Plaintiff Yvette Cooper is a female former GardaWorld and BGE employee.  (ECF No. 8 ¶ 1.)  GardaWorld provides security services at BGE's corporate headquarters in Baltimore, Maryland.  *Id.* ¶ 7.  Plaintiff began working in November 2021 and was terminated in August 2022.  *Id.* ¶¶ 18, 41.  At all times relevant, Plaintiff's supervisor was Tavon Roberts ("Roberts").  *Id.* ¶ 21.

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Complaint.  (ECF No. 8.)

During her employment, Plaintiff interacted with Roberts daily.  (ECF No. 8 ¶ 23.)  A majority of Plaintiff's interactions with Roberts took place in his office.  *Id.* ¶ 24.  On one occasion, after working for approximately 30 days, Plaintiff called Roberts and told her to come to his office.  *Id.* ¶ 25.  When she arrived, "the door shut and locked" automatically.  *Id.* ¶¶ 24–25.  As Plaintiff was leaving, Roberts said: "You really look good in your uniform."  *Id.* ¶ 26.  Roberts' tone made Plaintiff feel uncomfortable and Plaintiff informed her co-worker about the incident the next day.  *Id.* ¶¶ 26–27.  The co-worker told Plaintiff that Roberts was "having a relationship" with another female employee ("Morrison").  *Id.* ¶ 27.

On another occasion, in November 2021, Plaintiff went to Roberts' office to report a security officer was not performing as expected.  (ECF No. 8 ¶ 31.)  After their discussion, with the door locked and closed, Roberts walked towards Plaintiff, "squeezed her butt," and said, "you know I like you."  *Id.*  Plaintiff was scared and ashamed to complain (to another employee), and was concerned she would lose her job because Roberts was a supervisor and due to her "interim probationary status."  *Id.*  She also believed "no corrective action would be taken if she complained" in view of the fact that it was generally known Roberts was engaged in a sexual relationship with Morrison.  *Id.*

Soon thereafter, Plaintiff asked Roberts if he was romantically involved; they agreed to meet outside of work at Roberts' house where they engaged in sexual intercourse.  *Id.* ¶ 32.  Over the course of the next several months, Plaintiff and Roberts had sexual relations in Roberts' office two to three times a week.  (ECF No. 8 ¶¶ 33–37.)  In February 2022, following sexual intercourse, Roberts told Plaintiff, "if you keep this up, you will not have to worry about receiving overtime."  *Id.* ¶ 34.  "With the lure of receiving additional pay in exchange for providing sexual favors and intimidated by Mr. Roberts' apparent position of authority, Plaintiff Cooper did not inform anyone

of this incident." *Id.* Following Roberts' comment, Plaintiff's income increased from $1100 to $1400 every two weeks after she started performing sexual favors for Roberts. *Id.*

Roberts' behavior continued through March 2022—"Roberts would demand that Plaintiff Cooper perform sexual acts on him in his office during her shift." (ECF No. 8 ¶ 35.) During this time, Plaintiff learned that Roberts continued to have a sexual relationship with Morrison as well as another "officer named 'Goings' who reported to [Roberts]." *Id.* In April and May 2022, "Plaintiff continued to have intercourse with Roberts two to three times a week in exchange for the continued increase in overtime pay." *Id.* ¶ 36. Plaintiff alleges that the sessions of intercourse consisted of physically humiliating acts and aggressive demands by Roberts. *Id.* "Plaintiff considered Mr. Roberts' behavior and demeanor during these sessions to be abusive, physically and mentally, causing her to feel anxiety and depression during the time remaining on her shift on the dates that the intercourse occurred, and further into the evening before having to return again to work." *Id.*

In May 2022, Plaintiff informed Roberts that she was not going to continue to have intercourse with him, following which Roberts discontinued "giving Plaintiff Cooper additional overtime;" Roberts gave other female employees "who continued to have sex with him" overtime opportunities. In addition, Roberts' attitude and behavior changed towards Plaintiff. This caused Plaintiff distress; she changed her workplace conduct to avoid him and felt "anxiety and depression on a nightly basis." (ECF No. 8 ¶¶ 37–38.)

In late August 2022, Plaintiff was given a drug test for marijuana. *Id.* ¶ 41. Roberts informed Plaintiff that the drug test was "inconclusive and faulty." *Id.* On August 26, 2022, Roberts reached out to Plaintiff to inform her that his supervisors were "using the drug test as a positive," and that Plaintiff was fired. *Id.* Plaintiff's last day of work was August 26, 2022. *Id.*

3

On August 29, 2022, Major Engle, a GardaWorld employee, contacted Plaintiff and asked if she was resigning.  (ECF No. 8 ¶ 42.)  Plaintiff responded that Roberts told her she was fired; Engle did not respond.  *Id.*  Plaintiff informed Engle about Roberts' behavior.  Roberts was fired the next day.  *Id.*  During the first week of September 2022, Plaintiff called human resources at GardaWorld and indicated that she wanted to speak to someone about her job.  *Id.* ¶ 43.  GardaWorld never returned Plaintiff's call.  Plaintiff did not receive an exit interview or written notice of the basis of her termination.  *Id.*

Plaintiff alleges that when she refused to continue a sexual relationship with Roberts, "he engaged in retaliation resulting in [her] termination." *Id.* ¶ 7.  After Plaintiff's termination, Roberts continued to send Plaintiff text messages.  *Id.* ¶ 44.  "To date, Plaintiff Cooper continues to battle her increased signs of depression on the basis that she believes that she lost her job because she refused to continue to have sex with her boss." *Id.* ¶ 46.

On September 25, 2023, Plaintiff filed this action against BGE and GardaWorld in the Circuit Court for Baltimore City, Maryland.  (ECF No. 8.)  On November 15, 2023, GardaWorld removed the action to this court.  (ECF No. 1.)  The Complaint asserts claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*  ("Title VII"), and the Maryland Fair Employment Practices Act, MD. CODE ANN., STATE GOV'T §§ 20-606, *et seq.* ("FEPA") (Counts I and IV); *quid pro quo* harassment in violation of Title VII and FEPA (Counts II and V); retaliation in violation of Title VII and FEPA (Counts III and VII); hostile work environment in violation of Title VII (Count VI); and common law wrongful termination (Count VIII).  With respect to each count, Plaintiff demands $1,000,000.00 dollars in compensatory damages, $10,000,000.00 in punitive damages, and any other relief this court deems just and proper.  (ECF No. 8 ¶¶ 55, 61, 67, 74, 81, 87, 93, 100.)

4

GardaWorld moves to dismiss on several grounds: (1) Plaintiff fails to allege facts to support unlawful termination based on sex; (2) Plaintiff failed to exhaust administrative remedies as to her *quid pro quo* claims and, in any event, she fails to state a claim; (3) Plaintiff fails to allege a protected activity and causal connection in support of her retaliation claim; (4) Plaintiff fails to allege the elements to state a claim for hostile work environment; and (5) Plaintiff's wrongful termination claim fails for lack of identified public policy.  (ECF No. 13-1 at 3–4, 7–19.)  BGE seeks dismissal of Plaintiff's wrongful termination claim (Count VIII) as duplicative of Plaintiff's statutory Title VII-based claims.  (ECF No. 12-1 at 3.)

## II.     LEGAL STANDARD

### Federal Rule of Civil Procedure 12(b)(6)

A motion asserted under Rule 12(b)(6) "test[s] the sufficiency of a complaint;" it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).  "[A] complaint that provides

no more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations omitted).

## III.   <u>CONSIDERATION OF EXHIBITS</u>

Attached to GardaWorld's Motion is one exhibit—Plaintiff's EEOC Charge of Discrimination. (ECF No. 13-2.) In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court usually does not consider evidence outside of the complaint. A court may consider documents attached to a motion to dismiss if the document is "integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)). "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'" *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for

summary judgment. *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on the state and federal government websites."). "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, 3:20-cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)); *Campbell v. Becton, Dickinson & Co.*, No. 1:22-CV-03043-ELH, 2024 WL 1299354, at *15 (D. Md. Mar. 27, 2024) (same).

Because Plaintiff's entitlement to sue arises from the filing of the EEOC Charge and she makes no authenticity challenge, the court considers it without converting the GardaWorld Motion into one for summary judgment.

## IV.   **ANALYSIS**

### A.   **Title VII and FEPA**

In her Complaint, Plaintiff asserts various discrimination and retaliation claims under Title VII and FEPA. Because the court "applies 'Title VII case law in adjudicating [FEPA] claims,'" the court will apply the federal standard to Plaintiff's FEPA claims. *Grant v. Balt. Police Dep't*, No. CV RDB-21-2173, 2022 WL 1321593, at *7 (D. Md. May 3, 2022) (quoting *Linton v. Johns Hopkins Univ. Applied Physics Lab.*, LLC, No. JKB-10-276, 2011 WL 4549177, at *4 n.3 (D. Md. Sept. 28, 2011); *see Alexander v. Marriott Int'l, Inc.*, No. RWT 09cv2402, 2011 WL 1231029 at *6 (D. Md. Mar. 29, 2011) (noting that the MFEPA "is the state law analogue to Title VII").

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3." *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). "A

plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."[2]  *Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022).  Pursuant to the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  Importantly, however, at the motion to dismiss stage, "[i]t has long been the rule that 'an employment discrimination plaintiff need not plead a prima facie case of discrimination under the evidentiary framework set forth in *McDonnell Douglas Corp.*" *Holloway v. Md.,* 32 F.4th 293, 298 (4th Cir. 1973). "Instead, a Title VII plaintiff is 'required to allege facts to satisfy the elements of a cause of action created by that statute.'" *Bing v. Brivo Systems, LLC,* 959 F.3d 605, 616 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Trasnp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)).  In analyzing whether a plaintiff states a claim, the Fourth Circuit cautions "that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Felder v. MGM Nat'l Harbor, LLC*, No. 20-2373, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (per curiam) (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017)).

### 1.    Hostile Work Environment (Count VI)

"In the years since Title VII's enactment, the Supreme Court has made clear that discrimination on the basis of sex may be manifested in a variety of ways."  *Campbell v. Becton,*

---

[2] FEPA claims may also proceed under the *McDonnell Douglas* burden-shifting framework.  *See Hutty v. PNC Bank, N.A.*, JKB-21-2535, 2024 WL 1014080, at *3 (D. Md. Mar. 8, 2024) ("When analyzing discrimination claims [under Title VII and the FEPA], courts employ the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) . . . .").

*Dickinson & Co.*, No. 1:22-CV-03043-ELH, 2024 WL 1299354, at *19 (D. Md. Mar. 27, 2024). "Sexual harassment represents one form of this prohibited sex discrimination." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 390 (D. Md. 2010) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Sexual harassment "occurs when sexually demeaning behavior so infects an employee's work environment as to render it hostile or abusive." *Lewis v. Forest Pharmaceuticals, Inc.*, 217 F. Supp. 2d 638, 646 (D. Md. 2002).

GardaWorld argues that Plaintiff's hostile work environment claim is subject to dismissal for various reasons.  First, GardaWorld argues that Plaintiff alleges a consensual sexual relationship with Roberts and, therefore, may not recover on the basis that she was subject to unwelcome sexual conduct.  (ECF No. 13-1 at 15.)  GardaWorld also argues that Plaintiff fails to allege that her relationship with Roberts unreasonably interfered with her work performance.  *Id.*  Lastly, GardaWorld contends that Plaintiff failed to advise GardaWorld about Roberts' conduct prior to her separation, and once GardaWorld learned of Roberts' conduct, GardaWorld took prompt, remedial action by firing him.  *Id.* at 16.

Although at the motion to dismiss stage, Plaintiff need not plead facts sufficient to establish a prima facie case, "reference to the prima facie case informs a court's evaluation of the adequacy of a plaintiff's allegations in the face of a motion to dismiss." *Campbell*, 2024 WL 1299354, at *13.  To maintain a claim for hostile work environment, Plaintiff must allege that: "(1) she experienced unwelcome harassment; (2) the harassment was based on her gender []; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

GardaWorld does not dispute, and the court is satisfied, that Plaintiff satisfies the second element – Roberts allegedly harassed her "because of" her sex. *See Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) ("An employee is harassed or otherwise discriminated against 'because of' his or her sex if, 'but-for' the employee's sex, he or she would not have been the victim of the discrimination.") (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)).  The court's analysis will therefore focus on elements one, three, and four.

### a.    Unwelcome Conduct

"The first element of a hostile environment claim, unwelcome conduct, is not a high hurdle." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 328 (4th Cir. 2018).  "The alleged conduct need not be severe, as severity is better addressed under the third element, pervasiveness." *Id.* at 329.  "However, the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) ("[I]t is difficult to see how any employee would welcome derisive behavior directed at his faith.")).

"Conduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Roberts v. Glenn Indus. Grp., Inc.,* 998 F. 3d 111, 117–18 (4th Cir. 2021) (quoting *Albero v. City of Salisbury,* 422 F. Supp. 2d 549, 557–58 (D. Md. 2006)).  "[A]n employee can demonstrate that certain conduct is unwelcome simply by voicing [her] objection to the alleged harasser or to the employer." *Strothers*, 895 F.3d at 328–29; *see also Sunbelt Rentals, Inc.*, 521 F.3d at 314  (holding that "[a] reasonable jury could determine that the religious harassment here was unwelcome" when employee "complained, both verbally and in writing, about the alleged harassment to his supervisors").  Ultimately, "the question [of] whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact[.]" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57,

68 (1986).

Construed in the light most favorable to Plaintiff and taken as true, Plaintiff alleges unwelcome conduct.  The allegations in the Complaint suggest that Plaintiff's relationship with Roberts was at one point consensual, but grew to be non-consensual; specifically, Plaintiff continued to engage in the sexual relationship because she was intimidated by Roberts' demanding and threatening conduct, and feared losing her job.  (ECF No. 8 ¶¶ 7, 31, 34–36.)  Plaintiff also alleges that, at the end of May 2022, she was "disgusted with the quid pro quo arrangement with Mr. Roberts" and informed him "that she was not going to continue having intercourse with him." *Id.* ¶ 37.

GardaWorld's arguments as to whether the alleged conduct was unwelcome largely go to the merits of Plaintiff's claim and/or turn on credibility determinations, and therefore provide an inappropriate basis for 12(b)(6) dismissal of the Complaint.  *See Meritor*, 477 U.S. at 68 (noting that "whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact").

### b.    *Severe or Pervasive*

"The third element of a hostile environment claim requires that the offending conduct be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Strothers v. City of Laurel*, 895 F.3d 317, 331 (4th Cir. 2018) (quoting *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 333 (4th Cir. 2003)).  Generally, "viable hostile work environment claims [] involve repeated conduct . . . however, an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'"  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

"In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—*e.g.*, 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" *Id.* at 278 (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

"To determine whether the harassment was sufficiently severe or pervasive, a court must look to a totality of the circumstances." *Lewis v. Forest Pharmaceuticals, Inc.*, 217 F. Supp. 2d 638, 654 (D. Md. 2022) (citation omitted). "These circumstances include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance or significantly affects the employee's psychological well-being." *Id.* (citation omitted). "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1993)). "A recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citations omitted).

Critically, "whether harassment was sufficiently severe or pervasive is quintessentially a question of fact." *Mosby–Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (cleaned up); *see Smith v. First Union Nat. Bank*, 202 F.3d 234, 243 (4th Cir. 2000) (concluding that the district court incorrectly resolved the question of fact because "if proven at trial, [the alleged conduct] was sufficiently severe or pervasive so as to create a hostile work environment").

Here, Plaintiff alleges:

> As Plaintiff Cooper was leaving, and had her hand on the door to leave, Captain Roberts stunned her when he stated, "you really look

good in your uniform." His tone made her feel uncomfortable, as his tone sounded as though he desired to have a sexually intimate relationship with Plaintiff Cooper . . . .

…

After that discussion, with the door locked and closed, Captain Roberts walked toward her and squeezed her butt. He said, "you know I like you." Plaintiff Cooper, stunned, confused, and surprised, said, "I did not know that." When Mr. Roberts made this comment, Plaintiff Cooper had her hand on the door and was about to leave. Following this incident, Plaintiff Cooper was scared and ashamed to complain to any other employee of the Defendants as she was concerned she may lose her job given Mr. Roberts' supervisory position and her interim probationary status, and further felt that no corrective action would be taken if she complained given his known sexual relationship with employee Morrison.

…

On another occasion at the end of February 2022, Captain Roberts summoned Plaintiff Cooper to his office, closed and locked the door, and forcibly pushed her down on her knees with the intent of having Plaintiff Cooper perform fellatio. Mr. Roberts then ejaculated in her mouth and on her face, and then told Plaintiff to clean herself up. This incident lasted approximately 20-25 minutes. Following this incident, Mr. Roberts told the Plaintiff, "if you keep this up, you will not have to worry about receiving overtime." . . . .

Mr. Roberts' harassing behavior continued in March 2022. Specifically, once or twice a week, Captain Roberts would demand that Plaintiff Cooper perform sexual acts on him in his office during her shift . . . .

The sessions of intercourse during this time consisted of the physically humiliating act of Mr. Roberts ejaculating in Plaintiff Cooper's face and demanding her to "clean it up" in his presence, and being "submissive" to Mr. Roberts' lewd and aggressive demands to engage in various humiliating sexual positions for his pleasure. Plaintiff considered Mr. Roberts' behavior and demeanor during these sessions to be abusive, physically and mentally, causing her to feel anxiety and depression during the time remaining on her shift on the dates that the intercourse occurred, and further into the evening before having to return again to work . . . .

…

13

Specifically, beginning in November 2021 until May 2022, Plaintiff Cooper was subjected to sexual assault, both verbally and physically, on a weekly basis, ranging from unwanted touches to her body to physically demeaning intercourse. These advances and acts interfered with Plaintiff's performance by causing her to have to leave her post unattended for hours at a time, alter her patrol routine and, following her opposition to the advances, being subjected to the hostile and adversarial change in Mr. Roberts' behavior and attitude towards Plaintiff Cooper, causing the Plaintiff to (a) alter her method of communicating With Mr. Roberts and only doing so when there were witnesses present, (b) physically position herself around the office so as to not be in proximity to Mr. Roberts and/or his office, (c) refrain from engaging in a management style with respect to her reporting employees so as to not have to discuss any management-related issues with Mr. Roberts, (d) refrain from taking frequent bathroom breaks and refraining from using the break room so as to not be in proximity to Mr. Roberts and/or his office, (e) refrain from communicating with other female employees who reported to Mr. Roberts out of fear of retaliation by Mr. Roberts, and (f) experience nervousness, shame, and anxiety before, during, and after her shifts out of fear of losing her job or being the recipient of some form of retaliation by Mr. Roberts. These changes in her behavior lasted from May 2022 until her termination in August 2022 during every one of her shifts during the workweek. Such changes in her behavior caused her to have feelings of severe anxiety and depression on a nightly basis during this time causing her to have trouble sleeping and difficulty communicating with her peers at work due to her fear of being the recipient of some form of retaliation by Mr. Roberts.

(ECF No. 8 ¶¶ 26, 31, 34–36, 83.)

Plaintiff's allegations "are far beyond 'simple teasing [and] offhand comments.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 221 (4th Cir. 2011) (quoting *Faragher*, 524 U.S. at 788). Plaintiff alleges sexually explicit, lewd, demanding, and threatening behavior by her supervisor, Roberts, on various occasions and across a significant period of time. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (noting that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character"); *Okoli v. City of Baltimore*, 648 F.3d 216, 220–21 (4th Cir. 2011) (concluding that the alleged incidents of "fondling, kissing, propositioning,

describing sexual activities, and asking intimate questions" created a question of fact as to the severity of harassment); *Dawson v. Hous. Auth. of Baltimore City*, No. CV JKB-18-1442, 2019 WL 161497, at *3 (D. Md. Jan. 10, 2019) (concluding that the plaintiff sufficiently stated a hostile work environment claim where the plaintiff alleged that her supervisor "made sexually explicit, lewd, and humiliating comments to her on almost a daily basis over a period of month"); *Davis v. City of Charlottesville Sch. Bd.*, 498 F. App'x 231, 233 (4th Cir. 2012) (concluding that the plaintiff's allegation of sexual assault by a coworker "was sufficiently severe or pervasive to survive review at the pleading stage"); *Davenport v. Maryland*, 38 F. Supp. 3d 679, 687 (D. Md. 2014) (concluding that the plaintiff sufficiently stated a hostile work environment claim where she alleged sexual assault by a second-line supervisor). Moreover, Plaintiff alleges that Roberts' behavior caused her significant physical, mental, and emotional distress during and following her employment. (ECF No. 8 ¶¶ 38, 45–47.) *See Mosby-Grant*, 630 F.3d at 336 ("The conduct was also severe and humiliating in as far as it caused Mosby–Grant significant emotional distress with Mosby–Grant openly becoming emotional at work and regularly leaving work in tears."); *Dawson*, 2019 WL 161497, at *3 (noting the third factor satisfied where the plaintiff alleged "she isolated herself at work to avoid having contact with [her supervisor] and alleges his conduct caused her stress and affected her productivity").

Plaintiff's Complaint alleges sufficiently severe or pervasive sex-based harassment by Roberts.

### c.     *Imputable to the Employer*

The last element for a hostile work environment requires Plaintiff allege some basis for imputing liability to her employer. *Smith*, 202 F.3d at 243. "Where the alleged harasser is the employee's supervisor, however, an employer may be vicariously liable for sexual harassment

even if the employer had no knowledge of the harassment." *Bruce v. Fair Collections & Outsourcing, Inc.*, No. CIV. CCB-13-3200, 2014 WL 3052477, at *3 (D. Md. June 30, 2014). In *Faragher* and *Ellerth*, the Supreme Court explained:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998) (citation omitted); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (citation omitted).

Here, Plaintiff alleges that Roberts was her supervisor and, as such, had hiring and firing authority. *See Bruce*, 2014 WL 3052477, at *4, and *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim"). Plaintiff therefore sufficiently alleges a basis to impute liability to her former employer.

The GardaWorld Motion will be denied as to Count IV.

### 2. *Quid Pro Quo* Sexual Harassment (Counts II and V)[3]

Counts II and V raise claims for *quid pro quo* sexual harassment under Title VII and FEPA. (ECF No. 8 ¶¶ 57, 69.)

---

[3] As stated above, because "FEPA is the state law analogue of Title VII," the court will analyze Plaintiff's Title VII and FEPA *quid pro quo* sexual harassment claims together. *Alexander v. Marriott Int'l, Inc.*, No. RWT 09cv2402, 2011 WL 1231029 at *6 (D. Md. Mar. 29, 2011); *see Fisher v. J.O. Spice & Cure Co., Inc.*, No. CV CCB-19-1793, 2020 WL 363347, at *2 (D. Md. Jan. 22, 2020) (analyzing Title VII and FEPA sexual harassment claims together).

### a.   *Administrative Exhaustion*[4]

GardaWorld argues that Plaintiff's *quid pro quo* claims fail because she failed to exhaust the claim at the administrative level.  (ECF No. 13-1 at 7.)

Title VII and FEPA require a plaintiff to exhaust administrative remedies prior to bringing suit in court.  *See Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022) (citing 42 U.S.C. § 2000e-5(b), (f); 29 U.S.C. § 633a(d)) (explaining that "[i]t is well settled that before filing suit under Title VII or the ADEA, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC"); *Johnson v. United Parcel Serv., Inc.*, No. CIV.A. RDB-14-4003, 2015 WL 4040419, at *6 (D. Md. June 30, 2015) (concluding that FEPA requires administrative exhaustion prior to filing suit).  FEPA incorporates the Title VII exhaustion requirements. *See Johnson*, 2015 WL 4040419, at *6 n.12 (explaining that "Title VII and FEPA are analyzed as one because '[t]he Maryland Court of Appeals has deemed FEPA to be the state law analogue of Title VII, and has noted that Maryland courts traditionally seek guidance from federal cases in interpreting Maryland's [FEPA]' ") (quoting *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *4 n.3 (D. Md. Sept. 28, 2011)); *Alexander v. Marriott Intern., Inc.*, No. RWT-09-cv-2402, 2011 WL 1231029, at *6 (explaining that FEPA is "the state analogue of Title VII").

An EEOC charge serves two important purposes: (1) "it notifies the charged party of the asserted violation" and (2) "it brings the charged party before the EEOC and permits effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law."

---

[4] Administrative exhaustion is not a jurisdictional bar.  *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (holding that "Title VII's charge-filing requirement is not of jurisdictional cast"); *Jackson v. United States*, No. 8:22-cv-00772, 2022 WL 6754671, at *2 (D. Md. Oct. 11, 2022) (noting that although the exhaustion requirement is not jurisdictional, "it is a necessary step in pursuing the claim in [c]ourt").  Accordingly, administrative exhaustion is analyzed under Rule 12(b)(6).

*Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983), *rev'd on other grounds*, 729 F.2d 957 (4th

Cir. 1984).  In *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401 (4th Cir. 2013), the court

clearly explained the EEOC process:

> An employee complaining of illegal discrimination must first contact the EEOC and present it with information supporting the allegations. After receiving an employee's intake questionnaire and any other information the employee has provided, the EEOC typically assists the employee with filing a charge. This assistance often includes drafting a charge—as it did here—and then asking the employee to sign it.
>
> The EEOC sends a notice and copy of the charge to the employer. This notice gives the employer the chance to voluntarily conduct its own investigation and attempt to resolve any discriminatory actions internally. Concurrently, the EEOC investigates the charge.
>
> The filing of a charge also "initiates agency-monitored settlement, the primary way that claims of discrimination are resolved." This procedure "reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes." Prior to making any determination as to the merit of a charge, the EEOC may encourage and facilitate settlement between the parties.
>
> If the EEOC finds "reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." If the EEOC cannot reach a voluntary settlement with the employer, the agency may file a lawsuit or issue a Notice–of–Right–to–Sue to the employee. If the EEOC does not make a reasonable cause determination or the employee requests a right to sue, the agency may issue one, thus allowing the employee to file suit.

*Id.* at 407 (internal citations omitted).  The exhaustion requirement, therefore, is not "simply a

formality to be rushed through so that an individual can quickly file his subsequent lawsuit."

*Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  It "serves a vital function in the

process of remedying an unlawful employment practice."  *Balas*, 711 F.3d at 407.

Generally, "a plaintiff fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko*, 429 F.3d at 506. In *Walton v. Harker*, 33 F.4th 165 (4th Cir. 2022), the Fourth Circuit succinctly explained:

> A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. [F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge. Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII [or ADEA] lawsuit.

*Id.* at 172.

Relevant here, "because *quid pro quo* requires proof of an element that hostile work environment does not (*i.e. quid pro quo*), a *quid pro quo* claim is not reasonably related to and does not reasonably follow from an investigation of a charge of hostile work environment." *Davenport v. Maryland*, 38 F. Supp. 3d 679, 687 (D. Md. 2014). With this in mind, the court also recognizes that "EEOC charges often are not completed by lawyers and as such 'must be construed with utmost liberality.'" *Balas*, 711 F.3d at 408 (quoting *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988). The court, however, is not "at liberty to read into administrative charges allegations they do not contain." *Id.*

Here, while Plaintiff did not specifically include the term "*quid pro quo*" in her EEOC Charge, the court is satisfied that Plaintiff laid out sufficient allegations related to a *quid pro quo* claim. *See Atkins v. Burwell*, No. CV JFM-15-2198, 2016 WL 4399304, at *5 (D. Md. Aug. 17, 2016) ("Here, while Atkins did not specifically allege, in legal nomenclature, a *quid pro quo* claim in her EEOC charge, she did state a claim in that document reasonably related to a *quid pro quo*

claim."). "[T]o establish *quid pro quo* liability, a plaintiff must prove that a 'tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.'" *Moser v. MCC Outdoor, L.L.C.*, 256 F. App'x 634, 642 (4th Cir. 2007) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998)).

In the EEOC Charge, Plaintiff states:

> At the end of February 2022, Captain Roberts called me to his office and he pushed me down on my knees. I performed fellatio, he ejaculated in my mouth, and then I cleaned myself up. The incident lasted 20-25 minutes. I kept what had occurred to myself. He said "if you keep this up, you will not have to worry about receiving overtime." My check had been $857 every 2 weeks and moved up to between $1100 and $1400 every 2 weeks when I started performing sexual favors for him. I continued to perform sexual favors because I was afraid to lose my job and the additional money which had increased substantially. I was single and needed the money. I still have the check stubs which indicate these increases. He dominated me with the money.
>
> …
>
> Captain Roberts stopped giving my overtime when I stopped having sex with him. He continued to give overtime to the female employees who were sleeping with him. It was clear that he wanted to control me and force me to have sex with him to receive overtime. Our relationship became strained and I would stand at the door and not enter when speaking to him.

(EEOC Charge, ECF No. 13-2 at 13.)

Plaintiff's EEOC Charge was reasonably related to a *quid pro quo* claims. The court therefore declines to dismiss these claims for failure to exhaust. *See Atkins*, 2016 WL 4399304, at *6 (concluding that the plaintiff's *quid pro quo* claim is reasonably related to the EEOC charge and thus, the plaintiff exhausted her administrative remedies).

### b.       Failure to State a Claim

GardaWorld argues that Plaintiff's *quid pro quo* claims fail for the same reasons Plaintiff fails to state a claim for hostile work environment. (ECF No. 13-1 at 8–10.) Specifically,

GardaWorld contends that Plaintiff fails to allege that the conduct was unwelcome and fails to allege that she informed GardaWorld that she was subjected to such conduct during her employment. *Id.*

Title VII recognizes *quid pro quo* harassment as a circumstance "where sexual consideration is demanded in exchange for job benefits." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379 (D. Md. 2010) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). This occurs "when a superior tangibly punishes an employee for rebuffing his or her sexual advances or tangibly rewards an employee for submitting (unwillingly) to them." *Lewis v. Forest Pharmaceuticals, Inc.*, 217 F. Supp. 2d 638, 646 (D. Md. 2002).

To maintain a *quid pro quo* harassment claim, a plaintiff must allege:

> (1) The employee belongs to a protected group;
> (2) The employee was subject to unwelcome sexual harassment;
> (3) The harassment complained of was based upon sex;
> (4) The employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause a tangible job detriment to create liability; and
> (5) The employer knew or should have known of the harassment and took no effective remedial action.

*Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir.2011) (citation omitted). "With the fourth element, '[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742 (1998)). "The fifth element is 'automatically met' when the harassment was alleged to have been perpetrated by a supervisor." *Id.* (quoting *Spencer v. General Elec. Co.*, 894 F.2d 651, 658 n.10 (4th Cir. 1990)).

GardaWorld does not dispute, and the court is satisfied, that Plaintiff sufficiently alleges elements one, three, and four.  Plaintiff alleges that as a woman, she is a member of a protected class, and the harassment complained of was based on sex.  *See* Section, IV.A.1, *supra*.  As to the fourth element, Plaintiff alleges that Roberts "used his influence and power to increase Plaintiff's compensation and in direct exchange for sexual intercourse with Plaintiff Cooper."  (ECF No. 8 ¶¶ 57, 76.)  Plaintiff further alleges that she informed Roberts that she was not going to continue the sexual relationship and "thereafter, Roberts stopped giving Plaintiff Cooper additional overtime when she stopped having sex with him." *Id.* ¶¶ 37–38.  Indeed, Plaintiff alleges that when she refused to continue the sexual relationship with Roberts, "he engaged in retaliation resulting in Plaintiff's termination." *Id.* ¶ 7.  *See Okoli, supra; Nixon v. Kysela Pere Et Fils, Ltd.*, No. 5:21-CV-00011, 2021 WL 1996063, at *4 (W.D. Va. May 18, 2021) ("At the motion to dismiss stage, the court can readily infer that Nixon endured harassment in which a supervisor [Kysela] demand[ed] sexual consideration in exchange for job benefits. And conversely, the court cannot infer at this stage that any negative repercussions were solely the result of personal animosity.") (citation omitted).

As to the second element, for the same reasons set forth in Section IV.A.1.a, the court is satisfied that Plaintiff adequately alleges unwelcome conduct.  That notwithstanding, the court will address GardaWorld's additional arguments.   GardaWorld argues that Plaintiff's allegations "demonstrate the consensual nature of her relationship with Roberts;" therefore, GardaWorld argues, she fails to state a claim for *quid pro quo* sexual harassment.  (ECF No. 13-1 at 10.)  The court disagrees.

In *Meritor Sav. Bank, FSB v. Vinson*, the Supreme Court explained:

> . . . the District Court's conclusion that no actionable harassment occurred might have rested on its earlier "finding" that "[i]f

> [respondent] and Taylor did engage in an intimate or sexual relationship . . ., that relationship was a voluntary one." *Id.*, at 14,692, 23 FEP Cases, at 42. But the fact that sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII. The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." 29 CFR § 1604.11(a) (1985). While the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact, the District Court in this case erroneously focused on the "voluntariness" of respondent's participation in the claimed sexual episodes. The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary.

477 U.S. 57, 68 (1986).

While Plaintiff alleges that she consented for a period of time, Plaintiff also clearly and expressly alleges sexually explicit, lewd, demanding, and threatening behavior by her supervisor, Roberts, on various occasions across a significant span of time.  (ECF No. 8 ¶¶ 7, 26, 31, 34–36, 45, 83.)  Plaintiff also alleges that at some point she refused to continue in the sexual relationship with Roberts, and, when she did so, Roberts retaliated against her by terminating her employment. *Id.* ¶ 7.  Based on Plaintiff's unambiguous allegations, the court neither assumes nor infers that following Plaintiff's original consent, every sexual encounter was consensual.  *See Meritor*, 477 U.S. at 68 (noting that "whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact"); *Nixon v. Kysela Pere Et Fils, Ltd.*, No. 5:21-CV-00011, 2021 WL 1996063, at *4 (W.D. Va. May 18, 2021) ("Although Nixon alleges that her relationship with Kysela started as consensual, the court cannot assume, based on these allegations, that the remainder of the relationship—and therefore every sexual encounter between Nixon and Kysela—was consensual, especially in light of the factual allegation that Nixon sought counseling to help her end it.").  In any event,

voluntariness "is not a defense to a sexual harassment suit brought under Title VII." *See Meritor*, 477 U.S. at 68. Accordingly, that Plaintiff alleges that her relationship with Roberts was at one point consensual does not alter the court's analysis as to the unwelcome conduct.

As to the fifth element, Plaintiff alleges that the sexual harassment was committed by Roberts, her supervisor; therefore, the fifth element is satisfied. *See Okoli, supra; Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 745-46 (D. Md. 2003) ("[B]ecause the harassment was being committed by [a supervisor], the fifth element is automatically satisfied because, under 42 U.S.C. § 2000e(b), knowledge of the harassment is imputed to the employer through its agent-supervisor.").

Accordingly, Plaintiff sufficiently alleges *quid pro quo* claims under Title VII and FEPA.

### 3.   Disparate Treatment (Counts I and IV)

In Counts I and IV, Plaintiff asserts discrimination claims on the basis of gender pursuant to Title VII and FEPA.

"Sexual harassment, such as '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature,' may also constitute sex-based discrimination." *Campbell v. Becton, Dickinson & Co.*, No. 1:22-CV-03043-ELH, 2024 WL 1299354, at *19 (D. Md. Mar. 27, 2024) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). Relevant here, disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

"Absent direct evidence, the elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the

protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).  As noted, "[a] plaintiff is not required to plead a prima facie case of discrimination under Title VII to survive a motion to dismiss." *Felder v. MGM Nat'l Harbor, LLC*, No. 20-2373, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (*per curiam*).  Thus, at this stage, Plaintiff is required only to "plausibly allege that she was terminated *because of* her race, color, or sex to withstand a motion to dismiss." *Id.* (citations omitted); *see McCleary Evans v. Md. Dep't of Transp.,* 780 F.3d 582, 585 (4th Cir. 2015) (explaining that the plaintiff is "required to allege facts to satisfy the elements of a cause of action created by that statute"); *Campbell v. Masten*, 955 F. Supp. 526, 528 (D. Md. 1997) ("In order to advance a claim of sex/gender discrimination . . . a plaintiff must at least allege significant acts which, if proven, would demonstrate that the defendant . . . treated her in a disparate fashion on the basis of gender.") (citing *Balazs v. Liebenthal*, 32 F.3d 151, 155 (4th Cir. 1994)); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) ("A disparate treatment claim requires a showing of an adverse employment action 'either because of gender or because a sexual advance was made by a supervisor and rejected'") (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992)).

GardaWorld argues that, even assuming Plaintiff sufficiently alleges the first three elements of a disparate treatment claim, Plaintiff's claim still fails because there are no factual allegations to suggest that Plaintiff "was terminated because of her sex or that she was treated differently than similarly situated male employees as it relates to her termination."  (ECF No. 13-1 at 3-4.) GardaWorld maintains that Plaintiff's allegation "demonstrates that she was not treated differently because of her sex; rather, she was treated differently because she was no longer involved in a relationship with Roberts."  (ECF No. 13-1 at 6.)  GardaWorld directs the court's attention to *Campbell v. Masten*, 955 F. Supp. 526 (D. Md. 1997).

In *Campbell v. Martin*, the court explained that "[i]n order to advance a claim of sex/gender discrimination, separate and apart from plaintiff's sexual harassment claims, plaintiff must at least allege significant acts which, if proven, would demonstrate that the defendant . . . treated her in a disparate fashion on the basis of gender." 955 F. Supp. 526, 528 (D. Md. 1997). In that case, the plaintiff entered a consensual sexual relationship with another employee named Masten. *Id.* at 527. Shortly after beginning work, the plaintiff received a $5,000 raise. *Id.* While Masten was not the plaintiff's supervisor or manager, Masten claimed "responsibility for that raise, had supervisory authority over her, and attached 'unspoken expectations' to her receipt of this raise." *Id.* Subsequently, Masten broke off the relationship and became engaged to another woman. *Id.* at 527–28. After their relationship came to an end, the plaintiff alleged that Masten became critical of her work. *Id.* at 528. The plaintiff was then asked to resign by her manager and was subsequently fired by the co-owners of the company. *Campbell*, 955 F. Supp. at 528. In her complaint, the plaintiff asserted "that her termination was causally connected to Masten's criticism, who was motivated to force her from [the company] due to his fear that 'his wife would find out that he had been sexually involved with [the plaintiff] at the time of their engagement.'" *Id.*

While the *Campbell* court agreed that the plaintiff's relationship with Masten, as alleged, was premised on her sex (thus establishing the basis of her Title VII claim), the court concluded that her allegations, if true, failed to establish that the terms and conditions of her employment were affected by her status as a woman, and not "simply [] a result of personal incompatibility and petty grudges":

> Title VII unequivocally prohibits "discrimina[tion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). In this case, Campbell states no facts which if taken as true create a causal connection between her gender as such and any ill will demonstrated by her supervisors. Nowhere is it

alleged that Campbell was treated differently than her co-workers, on the basis of gender.

Instead, Campbell argues she suffered ill treatment and was subsequently terminated because Masten perceived her as a threat to his marriage, and that due to Masten's close relationship with various members of Wildlife management, Wildlife management retaliated against Campbell for her involvement with Masten. She states, "[c]learly, she would not be perceived as such a threat had he not initiated an affair with her, and he would not have done that but for her gender as a female." (Pl.'s Opposition to Def's Mot. to Dismiss at 5.) This Court agrees that Masten's affair with Campbell, and subsequently, his apparent antipathy for her are indeed premised on the underlying fact that Campbell is a woman, given his apparent heterosexuality. Campbell's status as a woman, however, is only the foundation on which her Title VII claim, if valid, would proceed. From that foundation, Campbell must offer some allegation that the terms and conditions of her employment were affected because of her status as a woman, not simply as a result of personal incompatibility and petty grudges. In the absence of such a distinction, any workplace affected by consensual workplace romances gone sour, and the concomitant workplace politics, could spawn Title VII claims. *See Trautvetter v. Quick*, 916 F.2d 1140, 1151 (7th Cir. 1990) (discussing an analogous claim).

955 F. Supp. at 528. Accordingly, the *Campbell* court granted the defendants' motion to dismiss the plaintiff's sex discrimination claim. *Id.* at 529.

The instant case differs materially from *Campbell*. As an initial matter, the court appreciates that "a complaint that merely alleges a co-worker is similarly situated without providing facts to substantiate that similarity fails to state a claim for discrimination." *Booth v. Cnty. Exec.,* 186 F. Supp. 3d 479, 486 (D. Md. 2016). But "[a] plaintiff is not required to plead a prima facie case of discrimination under Title VII to survive a motion to dismiss." *Felder*, 2022 WL 2871905, at *1. The instant case presents a scenario where "a male supervisor makes sexual overtures to a female worker[.]" *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). At this stage, "it is obvious that the supervisor did not treat male employees in a similar

fashion . . . . [and] [i]t will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment." *Id.*

In further contrast to *Campbell*, Plaintiff alleges (1) "she was treated differently from similarly situated male employees as male employees did not have to submit to Mr. Roberts' demand for sexual factors in exchange for overtime compensation;" (2) she was "treated differently from and less preferably than similarly situated male employees who did not have to repeatedly succumb to Mr. Roberts' demeaning, lewd, and sexually explicit and illegal behavior;" (3) she was subjected to sexually explicit, lewd, demanding, and threatening behavior by her supervisor, Roberts, on various occasions, over a significant period; and (4) at some point she refused to continue in the sexual relationship with Roberts, following which Roberts fired her. (ECF No. 8 ¶¶ 26, 31, 34–36, 45, 51, 70, 83.)  *See Bundy v. Jackson*, 641 F.2d 934, 942–43 (D.C. Cir. 1981) (rejecting argument that plaintiff was not subject to sex discrimination because her termination was because she refused sexual advances not because of her sex, noting that "'[b]ut for her womanhood . . . [the plaintiff's] participation in sexual activity would never have been solicited. To say, then, that she was victimized in her employment simply because she declined the invitation is to ignore the asserted fact that she was invited only because she was a woman subordinate to the inviter in the hierarchy of agency personnel'") (quoting *Barnes v. Costle*, 561 F.3d 983, 989–990 (D.C. Cir. 1977)).

Construed in the light most favorable to Plaintiff and taken as true, the Complaint sufficiently alleges that Plaintiff suffered discrimination on the basis of sex.[5]  The GardaWorld Motion will be denied as to Counts I and IV.

---

[5] GardaWorld argues further that Plaintiff's allegation that her termination was premised on an inconclusive drug test undermines any inference that her termination was unlawful.  (ECF No. 13-1 at 4; citing *Nance v. Clerk of Circuit Court for Baltimore City*, No. 1:23-CV-01869-JMC, 2023 WL 8650346 (D. Md. Dec. 14, 2023)). The court disagrees.

### 4. <u>Retaliation (Counts III and VII)</u>

In Counts III and VII, Plaintiff asserts retaliation claims under Title VII and FEPA.  To state a claim for retaliation, Plaintiff must allege that (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) a causal link exists between the protected activity and the adverse employment action.  *Roberts v. Glenn Indus. Grp., Inc.,* 998 F.3d 111, 122 (4th Cir. 2021).  Here, Plaintiff alleges an adverse employment action – termination – therefore, the court's analysis will focus on the first and third elements.  *See Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) ("'Discharge' from employment is one form of adverse employment action." ).

#### a. *Protected Activity*

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'"  *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (quoting *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994)).  It also "includes an employee's opposition to what he or she believes is an unlawful employment practice." *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (finding that protected activity includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in

---

While courts have "found that purported adverse employment actions are rendered implausible as retaliatory at the motion to dismiss stage where there is such an obvious alternate explanation for the employment actions," GardaWorld fails to consider the entirety of Plaintiff's Complaint. *Faulkenberry v. Austin*, No. 1:22-CV-01150-JMC, 2024 WL 449297, at *9 (D. Md. Feb. 6, 2024); *see Nance*, *supra*; *Barnhill v. Garland*, 636 F. Supp. 3d 592, 605 (E.D. Va. 2022) (concluding that the plaintiff's Title VII claim, without more, was "rendered implausible in light of an obvious alternative explanation" for the adverse employment action).  Construed in the light most favorable to Plaintiff and taken as true, the Complaint makes clear that Plaintiff contends that Roberts terminated her because she stopped engaging a sexual relationship with him and used the "pretext of a failed drug test" as a beard.  (ECF No. 8 ¶¶ 2, 41, 89.)  *Cf. Faulkenberry*, 2024 WL 449297, at *9 (dismissing retaliation claim where "there is such an obvious alternative explanation for the employment actions" and the plaintiff did not present "sufficient allegations or argument to demonstrate pretext").  Plaintiff's Complaint contrasts materially with the pleadings in the cases on which GardaWorld relies.

order to bring attention to an employer's discriminatory activities.") While "[c]omplaints about management activities that would not constitute unlawful discrimination do not count as protected activity," *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018), "where the employer understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity." *Bowman*, 173 F. Supp. 3d at 238 (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)).

GardaWorld argues that Plaintiff's retaliation claim is subject to dismissal because Plaintiff fails to allege a protected activity. (ECF No. 13-1 at 11.) Plaintiff contends that GardaWorld unlawfully retaliated against her by terminating her employment in response to her opposition to "Mr. Roberts' demands for sex in exchange for a sustained increase in compensation." (ECF No. 8 ¶ 63.) Here, "the unlawful employment practice at issue is sexual harassment in the workplace." *Owen v. County of Franklin, Virginia*, 358 F. Supp. 3d 545, 550 (W.D. Va. 2019). The *Owen* court explained:

> The Fourth Circuit has not addressed the question of "whether a person who rejects a supervisor's sexual advances has engaged in protected activity." *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (assuming, for purposes of argument, "that there may be circumstances in which a person who rejects his supervisor's sexual advances has engaged in a protected activity"). There is a split of authority among the few circuits that have decided the issue. The Eighth Circuit has held that a plaintiff "engage[s] in the most basic form of protected activity when she [tells] her supervisor . . . to stop his offensive conduct." *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (internal quotation marks omitted). Similarly, the Sixth Circuit has concluded that "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). It appears that the Fifth Circuit is the "only [circuit that] has concluded that communication directly solely to a harassing supervisor does not constitute protected activity." *Id.* at 1068. In *LeMaire v. Louisiana*, 480 F.3d 383 (5th Cir. 2007), the Fifth Circuit observed that "the only arguable protected activity" was the plaintiff's "actual rejection

> of [the harassing supervisor's] advances" and that the plaintiff had provided "no authority for the proposition that rejecting sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII." 480 F.3d at 389. Consequently, the Fifth Circuit affirmed the grant of summary judgment to the employer on the retaliation claim. *Id.* (citing *Frank v. Harris Cty.*, 118 F. App'x 799, 804 (5th Cir. 2004) (unpublished) (upholding judgment for the employer where the plaintiff provided "no authority for the proposition that a single 'express rejection' to [a supervisor] constitutes as a matter of law a protected activity for purposes of retaliation")).

358 F. Supp. 3d at 550. Relying on the Sixth and Eighth Circuits, the plain language of the opposition clause, and the Fourth Circuit's "expansive view of what constitutes oppositional conduct," *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015), the *Owen* court concluded "that the protection afforded by the opposition clause extends to employees who demand that supervisors stop engaging in sexually harassing behavior, and that a reasonable jury could find that the plaintiff engaged in protected oppositional activity in the instant case." 358 F. Supp. 3d at 552. The *Owen* court's analysis is persuasive and sound; as is the Sixth Circuit's analysis in *EEOC v. New Breed Logistics*:

> Sexual harassment is without question an 'unlawful employment practice.' If an employee demands that his/her supervisor stop engaging in this unlawful practice—*i.e.*, resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct. Importantly, the language of the opposition clause does not specify to whom protected activity must be directed. Therefore, it would be unfair to read into the provision a requirement that a complainant only engages in protected activity when s/he opposes the harassment to a particular official designated by the employer.

783 F.3d 1057, 1067–68 (6th Cir. 2015)).

Plaintiff's allegations that she "refused to provide" a continued sexual relationship with Roberts and that she informed him she would not continue the sexual relationship are sufficient to

satisfy the requisite protected activity.  (ECF No. 8 ¶¶ 7, 37.)  *See Owen, supra;*[6] *Bruce v. Fair Collections & Outsourcing, Inc.*, No. CIV. CCB-13-3200, 2014 WL 3052477, at *5 (D. Md. June 30, 2014) (noting the split in authority and allowing retaliation claim to go forward at the motion to dismiss stage because the *quid pro quo* claim is continuing).

### b.  Causal Connection

To satisfy the third element, a causal connection between the protected activity and the adverse action, a plaintiff must allege facts that show "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). "[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018) (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) (explaining that "very little evidence of a causal connection is required to establish a prima facie case of retaliation.").

There are "two routes" with which a plaintiff may attempt to demonstrate that a protected activity caused an adverse action. *Nance v. Clerk of Circuit Court for Baltimore City*, No. 1:23-CV-01869-JMC, 2023 WL 8650346 at *6 (D. Md. Dec. 14, 2023) (quoting *Gaines v. Balt. Police Dep't,* 657 F. Supp. 3d 708, 745 (D. Md. 2023)).  A plaintiff may either establish the "existence of facts that suggest that the adverse action occurred *because of* the protected activity.  Or a

---

[6] In *Owen*, the court noted: "[t]his is not a case in which an employee merely rejected a supervisor's advances on one occasion. Instead, the plaintiff's evidence indicates that Morris subjected Owen to increasingly inappropriate sexual comments and physical contact, and that she repeatedly told Morris to cease the harassment."  358 F. Supp. 3d 545, 551 (W.D. Va. 2019).  The court recognizes that, here, in contrast to *Owen*, Plaintiff alleges only one occasion when she told Roberts she was no longer going to have sex with him for overtime pay.  (ECF No. 8 ¶ 37.)  That notwithstanding, *Owen* was before the court on a motion for summary judgment; given the stage of the instant case, the court will allow the retaliation claim to proceed. *See Bruce*, 2014 WL 3052477, at *5 (noting the court's skepticism of the retaliation claim, but allowing it to proceed at the 12(b)(6) stage "[b]ecause the *quid pro quo* claim is continuing").

plaintiff may demonstrate that the adverse act bears sufficient temporal proximity to the protected activity." *Id.*

In establishing temporal proximity, "a lapse of time as *little as two months*" between the protected activity and the adverse employment action is long enough to weaken an inference of causation. *Id.* "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (*per curiam*) (citing with approval cases where courts found periods of three and four months too long); *see German v. Akal*, No. CCB-11-1242, 2011 WL 5974619, at *6 (D. Md. Nov. 29, 2011) (dismissing retaliation claim where, without more, the "four-month gap may be too long to provide a causal link between the two actions"). "In cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). "Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Id.*; *see Clark v. Snuipa II Inc.*, No. 8:10-cv-02027-AW, 2011 WL 5439000, at *5 (D. Md. Nov. 8, 2011) (concluding that while the complaint fails to allege the dates for the court to consider the temporal proximity, the plaintiff adequately alleged that the defendant fired her because she complained of sexual harassment).

Here, Plaintiff alleges that she rejected Roberts' sexual advances in May 2022 and that Roberts fired her on August 26, 2022, and that she was terminated because she refused to continue a sexual relationship with Roberts. (ECF No. 8 ¶¶ 7, 37, 41.) Plaintiff also alleges that, after she

rejected Roberts' sexual advances, Roberts engaged in conduct motivated or caused by retaliatory animus during the intervening behavior. *Id.* ¶ 37. Construed in the light most favorable to Plaintiff and taken as true, the Complaint plausibly alleges a causal link between Plaintiff's protected activity and her termination. *See Lettieri, supra; Clark v. Sunipa II Inc.*, No. 8:10-CV-02027-AW, 2011 WL 5439000, at *5 (D. Md. Nov. 8, 2011) (denying motion to dismiss retaliation claim where "even though the Complaint does not specify the dates on which Clark communicated her concerns to the employer, Clark adequately alleges that Sunipa fired her because she complained about the hugging incident.").

Accordingly, the GardaWorld Motion will be denied as to Counts III and VII.

### D.     Wrongful Termination (Count VIII)

GardaWorld argues that Plaintiff's wrongful termination claim is subject to dismissal because Plaintiff fails to plead with particularity the public policy allegedly violated. (ECF No. 13-1 at 18.) GardaWorld additionally contends that to the extent Plaintiff's wrongful termination claim is premised upon her allegation that she was terminated for refusing to engage in sexual relations with Roberts, the claim must be dismissed because a statutory remedy exists under Title VII. *Id.* at 19. BGE argues[7] that Count VIII should be dismissed as duplicative of Plaintiff's statutory claims. (ECF No. 12-1 at 3.) Plaintiff counters that "[b]ecause of the distinguishing presence of a violation of the Plaintiff's bodily integrity in this case, there is a sufficient public policy basis such that its violation gives rise to a wrongful discharge cause of action." (ECF No. 16 at 8.)

---

[7] As noted earlier, BGE moves to dismiss only Plaintiff's wrongful termination claim. (ECF No. 12.)

An employee may sue for wrongful discharge "when the motivation for the discharge contravenes some clear mandate of public policy." *Adler v. American Standard Corp.,* 291 Md. 31, 47 (1981).

> Under Maryland law, an employer may ordinarily discharge an at-will employee for any reason whatsoever. *See Adler v. Am. Standard. Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). However, Maryland recognizes the tort of abusive or wrongful discharge as a "narrow exception" to the general rule in circumstances where an at-will employee's termination contravenes a "clear mandate of public policy." *Id.* at 47, 432 A.2d at 473. An employee who asserts that he was wrongfully discharged must "specifically identify the clear mandate of Maryland public policy that was violated by his termination." *Szaller v. Am. Nat'l Red Cross, et al.*, 293 F.3d 148, 151 (4th Cir. 2002) (citing *Adler*, 291 Md. at 42–44). In order for a mandate of public policy to be well-established enough to form the basis of a wrongful discharge action, there "'must be a preexisting, unambiguous, and particularized pronouncement by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation.'" *Id.* (quoting *Porterfield v. Mascari II, Inc.*, 142 Md. App. 134 (2002)). The rationale for placing these limits on what constitutes a "clear mandate of public policy" is to "'limit[ ] judicial forays into the wilderness of discerning public policy without clear direction from a legislature or regulatory source.'" *Id.* (quoting *Milton v. IIT Research*, 138 F.3d 519, 523 (4th Cir. 1998)).

*Terry v. Legato Systems, Inc.,* 241 F. Supp. 2d 566, 569 (D. Md. 2003); *see also Wholey v. Sears Roebuck,* 370 Md. 38, 50–51 (2002) ("[T]o establish a wrongful discharge, the employee must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee.").

Importantly, "even where statutory and regulatory provisions supply a source of a public policy in the analysis of a wrongful discharge claim, if those provisions already provide an adequate and appropriate civil remedy for the wrongful discharge the claim will fail." *Porterfield*

*v. Mascari II, Inc.*, 374 Md. 402, 423 (2003). "The tort will not lie if the statute provides a civil remedy that would render relief via a wrongful discharge action duplicative." *Id.* at 423–24; *see Carson v. Giant Food, Inc,* 187 F. Supp. 2d 462, 483 (D. Md. 2002) (noting that wrongful termination suits "for employment discrimination are generally precluded because federal and Maryland anti-discrimination laws create a civil remedy to vindicate discrimination in employment settings."); *Terry*, 241 F. Supp. 2d at 569 (dismissing wrongful discharge claim to the extent it was based on "alleged retaliation by Defendant against Plaintiff for filing charges with the EEOC . . . because a remedy already exists under Title VII and state law"); *Kerrigan v. Magnum Ent., Inc.,* 804 F. Supp. 733, 735 (D. Md. 1992) ("It is clear when a remedy is available under Title VII or [Maryland Fair Employment Practices Law], an action for wrongful discharge will not lie in Maryland.").

With regard to her wrongful termination claim, Plaintiff alleges:

> The Defendants' conduct as alleged herein constituted a wrongful termination in violation of Title VII. Specifically, Plaintiff Cooper was discharged, her dismissal violated a clear mandate of public policy, and there is a nexus between the Defendants and their decision to fire Plaintiff Cooper. Plaintiff's dismissal violated a clear mandate of public policy because it was based upon the inconclusive results of a saliva test which was given to her to evaluate her for drug use. Plaintiff Cooper will produce testimony from Glenda Flemister, M.D. who is board certified in critical care, internal medicine, and pulmonology, former Director of Medicine for Aema of the Midwest, will testify that a saliva test is worthless in evaluating for drug use, and that a blood sample test is the standard within the community for determining conclusively whether an employee has recently used drugs.
>
> Additionally, Defendants are also liable for Plaintiff's wrongful termination given that she was discharged for refusing to continue to commit an unlawful and wrongful act, specifically, engaging in sexual relations in exchange for overtime compensation which is a violation of Title VII. Prior to Plaintiff's discharge, her performance met her employers' legitimate expectations. Given the time period of approximately ninety days which elapsed between the Plaintiff's

refusal to commit an unlawful act and her termination, a causal nexus exists between her discharge and Plaintiff's opposition.

Furthermore, Defendants, and the policies, practices, and/or procedures enacted and engaged in by their agents, servants, and employees resulted in wrongful termination affecting Plaintiff Cooper with respect to the terms and conditions of her employment. Defendants, by and through their agents, servants, and employees, perpetuated the wrongful termination affecting Plaintiff Cooper through conduct that was intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of Plaintiff Cooper, entitling Plaintiff Cooper to punitive damages.

As a proximate cause and result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost wages, lost back pay, lost benefits, loss of seniority status, and other economic and non-economic damages. Plaintiff is entitled to recover such monetary and compensatory relief and other damages from these Defendants under Title VII.

(ECF No. 8 ¶¶ 95–98.)

Plaintiff's wrongful termination claim fits squarely within her Title VII discrimination and retaliation claims, and therefore fails because a statutory remedy exists under Title VII. Further, although Plaintiff contends her termination violates "a clear mandate of public policy," she fails to identify any such mandate.[8]  The GardaWorld Motion and BGE Motion will be granted as to Count VIII.

---

[8] To the extent Plaintiff contends that she sustains a wrongful discharge claim on the basis that the alleged sexual harassment resulted in assault, Plaintiff may not amend her Complaint through her opposition. *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 731 (D. Md. 2023) ("Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of an opposition to a motion."); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993). Nothing in the Complaint suggests Plaintiff's wrongful discharge claim is premised on public policy related to sexual harassment resulting in assault; and, in any event, as set forth above, the Complaint fails to articulate any clear mandate of public policy on which her claim rests.

## V.    <u>**CONCLUSION**</u>

For the reasons set forth herein, by separate order, the BGE Motion (ECF No. 12) will be granted; the GardaWorld Motion (ECF No. 13) will be granted as to Count VIII and denied in all other respects.

/S/

_____
Julie R. Rubin
United States District Judge

August 16, 2024