**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

Yvette Cooper                    *
2301 North Calvert Street
Baltimore, Maryland 21218

       *Plaintiff*

vs.                                      Case Number 1:23-CV-03116

Baltimore Gas and Electric Company, et al.        *
2 Center Plaza
110 West Fayette Street
Baltimore, Maryland 21227

       *Defendants*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF YVETTE COOPER'S MOTION REQUESTING RELIEF FOR THE SPOLIATION OF EVIDENCE

Plaintiff, Yvette Cooper ("Plaintiff") by and through her undersigned counsel, Donald R. Huskey of the Law Office of Donald R. Huskey, L.L.C. and Governor Jackson, III of the Law Office Governor Jackson, III L.L.C. hereby file this Motion for Requesting Relief for the Spoilation of Evidence, and in furtherance of their Motion state as follows:

***Statement of Facts***

Plaintiff alleges that her wrongful termination from GardaWorld is attributed, in part, to the use by Defendant GardaWorld of the results of a drug test which was administered to Plaintiff Cooper on the premises of the BGE building in downtown Baltimore in violation of Maryland state law, specifically Maryland Health -General Code section 17-214-Job Related Alcohol and Controlled Dangerous Substances Testing : 2022 Maryland Code, and GardaWorld's own employee handbook requiring 'reasonable suspicion' for such testing. Jayson Ramsey, Defendant GardaWorld's General Manager who was involved in administering the drug test to

1

Ms. Cooper, testified that it was done on nothing more than a mere 'hunch' as he stated under

oath:

> "Q: Is there– was there, in 2022, a certain standard that in your mind reasonable suspicion had to meet in order to make the request of an employee to submit to drug and alcohol testing?
> MS. ABRAHMS: Objection. You can answer.
> A: There- no standard that I– to my knowledge.
> Q: So are you familiar with the common parlance of having a hunch about something? Have you heard that term before?
> A: I've heard it.
> Q: Okay. So in your mind then, was there a difference in 2022 of having a hunch about an employee being under the influence of drugs or having reasonable suspicion about an employee being under the influence of drugs, or were they one and the same?
> MS. ABRAHMS: Objection. You can answer.
> A: One and the same."
> *See Exhibit 1* [Depo. Tr. of Jayson Ramsey at p. 63-64].

GardaWorld employee Major Roy Engel testified about how the drug tests were

administered to Plaintiff Cooper as he stated:

> "Q: Did you– did you– would you go through how you took the sample or who took the sample from Ms. Cooper?
> A: So I presented Ms. Cooper with the drug test. It's sealed in a foil container. As you pull out the sample, there is a screw end with a swab that's on the inside, which that is also wrapped. The way that the test is given is the individual opens up the plastic themselves, places the swab in their mouth, and it can take four to five minutes, sometimes even longer to get enough saliva on the tube. Then you stick the swab in the tube, turn it tight, set it down for five to six minutes. As the chemicals do their job, they then put markings on the side of, I believe it's eight or nine different chemicals that they're looking for.
> Q: And how do you read that test as being positive and negative? What are you looking for?
> A: So two lines on any one of those chemicals is positive. And no lines at all is inconclusive. It's a voided test.
> A: Why did you give her a second test?
> A: Because on the first test, all of the chemicals except THC came up with two lines and there were absolutely no lines on the THC, which then voids the test."
> *See Exhibit 2* [Depo. Tr. of Roy Engel at p. 68-69]

Mr. Ramsey was unaware of what happened to the tests after they were administered as he

testified:

"Q: Are you aware of what happened to the mouth swab test after it was administered to Ms. Cooper?

    MS. ABRAHMS: Objection.

A: I– I don't know.

Q: Was it destroyed?

A: I don't know.

Q: Did you destroy it?

    MS. ABRAHMS: Objection.

A: No.

Q: Did you and Mr. Engel talk about destroying it?

    MS. ABRAHMS: Objection.

A: No.

Q: Did Mr. Roberts have access to it after it was administered?

    MS. ABRAHMS: Objection.

A: I do not know." *See Exhibit 1* at p. 102.

Plaintiff Cooper testified that Tavon Roberts confirmed to her that the inconclusive drug tests were going to be used as positive tests stating as follows:

"Q: You've been handed Exhibit 19 which is BGE 625, which is an email dated Friday, 8/26/2022, at 3:12 P.M. entitled Sergeant Yvette Cooper. It says: On August 26, 2022, at 9:30, Captain Tavon Roberts spoke with Major Roy Engel about Sergeant Yvette Cooper drug testing situation in which Major Engel told me that the inconclusive test will be given to human resources for a determination on that matter.

    Then it says: At about 10:30, Sergeant Cooper asked Tavon Roberts about the situation. So that's the morning of the 26th which is when you spoke?

A: I was going to say I didn't – that's a lie. I didn't ask him anything. He cam to me. He came to my desk and told me that I need to talk to you in the office. I never cam to him.

Q: Okay. And he said he responded to Sergeant Yvette Cooper that the inconclusive drug test would be given to human resources for more determination. Do you—

A: No.

Q: —— see that?

A: He never told me that, no.

Q: Then this says that you got angry asking why is there a determination being made about an inconclusive drug test.

A: No, I got upset because he told me they were going to use the inconclusive test as positives. That's when I got upset, like how could they use an inconclusive test as positive tests. That's what I was upset about.

Q: So he told you that they were using the inconclusive test as a positive?

A: Yes, ma'am."

*See Exhibit 3* [Depo. Tr. of Yvette Cooper at p. 235-236]

3

Counsel for GardaWorld confirmed that the swabs "were destroyed within a few weeks after they were administered" in correspondence sent to Plaintiff's counsel following Plaintiff's request for production of the drug tests. The correspondence stated, in relevant part, as follows:

> "The swabs were destroyed within a few weeks after the drug tests were administered - long before GardaWorld had notice of a potential legal claim by Ms. Cooper."
> *See Exhibit 4* [Correspondence from GardaWorld's counsel dated March 21, 2025]

Although Defense counsel claimed that GardaWorld was not on notice of a potential legal claim, this position is contrary to an e-mail correspondence by Roy Engel dated August 29, 2022-four days after the administration of the drug tests- which confirmed that Plaintiff Cooper in fact interrupted a phone conversation with Major Engel to Major Engle's knowledge for the purpose of speaking with her lawyer, a phone conversation wherein she was requesting the very drug tests which were administered and which are the subject of the instant Motion to Compel. Major Enge's e-mail stated in relevant part as follows:

> "On Monday 08/29/2022 at 11:13 a.m. I received a call from Yevette Cooper [sic] asking if she could get a copy of the drug test administered to her on Thursday 08/25/2022 [#3 picture attached- the test results were negative on all chemicals on the test except the THC spot on the test which was not negative or positive] this was the second test given that day, the first one I believed to have been compromised by Ms. Coopers lunch. With not having experience with tests and calling 5 different GardaWorld management employees including H.R. and not getting a timely response I made the decision to get a new test and have Cooper submit another sample."
> **********************************
> "Now, back to the call today after she made the request for the test I explained, that since she walked off I wasn't sure if GardaWorld would supply her with a copy or picture of the results due to the fact she was no longer an employee of GardaWorld. She then advised that since she no longer worked for us she would just be honest, that she and Capt. Roberts had been in a sexual relationship "consensual". She also advised that it had not been happening recently because Capt. Roberts was now in a sexual relationship with Aeisha Morrison who has been the driving force behind the marijuana use accusations on Cooper. She advised that several other employees had started looking for jobs because they

didn't want to be next on the hit list. I told her I would ask about her getting a copy of the results but I was pretty sure that would not happen, and she said "oh my lawyer is calling I have to go." And we hung up, as I was again thinking she was just trying to get the Capt. in trouble, minutes later she sent a text of a screen shot about a conversation she and Roberts had [please see #1 text thread attached.]"
*See Exhibit 5* [E-mail from Roy Engel to Jayson Ramsey dated August 29, 2022]

***Legal Standard***

Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999) (citing *Black's Law Dictionary* 1401 (6th ed.1990)). The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct "which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process).

The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. "[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions — all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition." United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir.1993) (recognizing "that when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action"). This district has recognized that when imposing spoliation sanctions, "the trial court has discretion to pursue a wide range of

responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir.1995).

A party seeking sanctions for spoliation must prove the following element (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it. Thompson v. U.S. Department of Housing & Urban Development, 219 F.R.D. 93, 100 (D.Md. 2003) (citing Zubulake v. UBS Warburg, LLC ("Zubulake IV"), 220 F.R.D. 212, 220 (S.D.N.Y.2003)).

### *Legal Analysis*

With respect to the first element, "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."Silvestri v. General Motors Corp., 271 F.3d 583 (2001). If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence. *See* Silvestri, *supra*, citing Andersen v. Schwartz, 179 Misc.2d 1001, 687 N.Y.S.2d 232, 234-35 (N.Y.Sup.Ct.1999).

In this case, the Defendant's reasonably knew that the evidence would be relevant to anticipated litigation given Ms. Cooper's request to review the test and her phone conversation

with Major Engle wherein she told him explicitly that she was speaking simultaneously with her lawyer during her verbal request to review the drug tests that were administered.

Once a party reasonably anticipates litigation, it is obligated to suspend its routine document retention/destruction policy and implement a "litigation hold" to ensure the preservation of relevant documents. Thompson, 219 F.R.D. at 100 (quoting Zubulake IV, 220 F.R.D. at 218). "Relevant documents" includes the following:

> [A]ny documents or tangible things (as defined by [Fed.R.Civ.P. 34(a)]) made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." The duty also includes documents prepared *for* those individuals, to the extent those documents can be readily identified (*e.g.,* from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action." Thus, the duty to preserve extends to those employees likely to have relevant information—the "key players" in the case.

Zubulake IV, 220 F.R.D. at 217-18 (footnotes omitted). Thus, as of August 29, 2022, 11:32 a.m., Defendant GardaWorld was obligated to implement a litigation hold with respect to relevant documents and "tangible things" (including the drug tests) and electronically stored information for the "key players" involved with the dispute with Plaintiff Cooper, including Tavon Roberts.

As for the second element, there are three possible states of mind that can satisfy the culpability requirement: bad faith/knowing destruction, gross negligence, and ordinary negligence. Thompson, 219 F.R.D. at 101 (citing Residential Funding v. Degeorge Financial Corp., 306 F.3d 99, 108 (2d Cir.2002)). The degree of fault impacts the severity of the sanction, and the Fourth Circuit has established guidelines to determine when the harshest of sanctions, such as summary judgment or default judgment, should be implemented. Goodman v. Praxair Services, 32 F.Supp.2d 494 (2009). Here, the Defendant's destruction of the tests amounts to bad faith given that their destructive actions occurred within only weeks after administering the tests with inconclusive tests following a request by the Plaintiff to review the tests (which was denied)

during which she specifically referenced speaking with her lawyer, and further coupled with the failure of Defendant GardaWorld to implement a litigation hold with respect to relevant documents and "tangible things" (including the drug tests) and electronically stored information for the "key players" involved with the dispute with Plaintiff Cooper. In fact, given the prominence of the drug test in the decision to terminate Plaintiff Cooper, Defendant GardaWorld's destruction of the drug test is similar to the destruction of the "sole piece of evidence" in the case at issue in Silvestri, *supra*. At the very least, Defendant GardaWorld's destruction was intentional, willful, and deliberate. Courts in this circuit have held that when assessing the willfulness of conduct, it is imperative to recognize that spoilation, even if not conducted in bad faith, can still be intentional, willful, or deliberate. Buckley v. Mukasey, 538 F.3d 306, 323 (4th Cir. 2008).

As to the third element, the drug tests that were destroyed are relevant to the claims of the party that seeks the discovery of the spoliated evidence for the aforementioned reasons, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims of the Plaintiff, particularly given the previously cited testimony of Ms. Cooper referencing that she was told by Tavon Roberts that Defendant GardaWorld was "using the inconclusive test as a positive." *See Exhibit 3*, supra.

Based on the Defendant's destructive conduct, Plaintiff Cooper respectfully request this honorable Court grant summary judgment in favor of the Plaintiff, or in the alternative issue an adverse jury instruction against Defendant GardaWorld for the purpose of trial in this matter. In Vodusek v. Bayliner Marine Corp., 71 F.3d 148, the appellate court noted that a showing of bad faith is not a prerequisite to obtaining an adverse jury instruction, and a court must only find that the spoliator acted willfully in the destruction of evidence:

[T]he trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence. While a finding of bad faith suffices to permit such an inference, *it is not always necessary.*... An adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party *knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction. Id.* at 156 (emphasis added).

Therefore, for these reasons stated, Plaintiff Cooper respectfully request this honorable Court grant summary judgment in favor of the Plaintiff, or in the alternative issue an adverse jury instruction against Defendant GardaWorld for the purpose of trial in this matter.

WHEREFORE, Plaintiff Cooper respectfully request this honorable Court grant summary judgment in favor of the Plaintiff, or in the alternative issue an adverse jury instruction against Defendant GardaWorld for the purpose of trial in this matter.

Respectfully submitted,

Donald Huskey /s/
Donald R. Huskey (Bar No. 22981)
CPF NO. 0712010286
Law Offices of Donald R. Huskey LLC
9419 Lyonswood Drive
Owings Mills, Maryland 21117
443-929-1001
dr.huskey@gmail.com

Governor Jackson, III /s/
Governor Jackson, III (Bar No. 27673)
Law Office of Governor Jackson,III, LLC
400 E. Joppa Road,
Suite 50
Towson, Maryland 21286
(410) 528-5150
(410) 528-1055 (f)
gjackson@governorjacksonlaw.com
CPF #0412140364

## CERTIFICATE OF SERVICE

I hereby certify on this 17th day of April 2025, that I electronically filed the foregoing Motion Requesting Relief for the Spoilation of Evidence thereby effectuating service upon all counsel.

Governor Jackson, III /s/
Governor Jackson, III