IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **YVETTE COOPER,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Case No: 1:23-cv-03116-JRR |
| **BALTIMORE GAS AND ELECTRIC COMPANY,** *et al.,* | * | |
| | * | |
| *Defendants.* | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION REQUESTING RELIEF FOR THE SPOLIATION OF EVIDENCE (TESTING SWABS)

Before the Court is Plaintiff Yvette Cooper's Motion Requesting Relief for the Spoliation of Evidence against Defendant GardaWorld based on its failure to retain testing swabs used in two drug tests administered on or about August 25, 2022 and deemed "inconclusive." (ECF No. 86). GardaWorld opposes the motion. (ECF No. 94). The Court has also reviewed Plaintiff's Reply. (ECF No. 105). The Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). As set forth more fully below, the undersigned recommends[1] that the parties' trial judge, U.S. District Judge Julie R. Rubin, deny Plaintiff's motion.

**I.   Background**

This sexual harassment and discrimination case was referred to the undersigned by Judge Rubin on January 8, 2025 for discovery and related scheduling. (ECF No. 56). Plaintiff contends

---

[1] Because Plaintiff seeks dispositive relief, the undersigned's authority as to such relief is limited to a "recommendation" to Judge Rubin pursuant to Local Rule 301.5.b. Additionally, although the request for an adverse inference jury instruction is non-dispositive and might be within the undersigned's authority pursuant 28 U.S.C. § 636(b) and Local Rule 301.5a, the undersigned nonetheless puts this in the form of a recommendation given that Judge Rubin, as the trial judge, should make any decisions regarding final jury instructions.

that she was sexually harassed by her former supervisor, Tavon Roberts ("Mr. Roberts") while both worked for GardaWorld providing security services at Co-Defendant Baltimore Gas and Electric's ("BGE") facility. Plaintiff does not deny sexual activities with Mr. Roberts, but contends it was part of a quid pro quo arrangement whereby Plaintiff's conditions of employment depended upon her willingness to engage is such activities with Mr. Roberts. (ECF No. 8 at 15-17). She further alleges that when she ceased the activities, Mr. Roberts changed her conditions of employment for the worse and retaliated against her. *Id*. at 17-18. She claims in her complaint that this ultimately led to her termination on or about August 26, 2022. *Id*. at 18.

Shortly after her separation from employment, Plaintiff alleges she provided some text messages between herself and Mr. Roberts to Major Roy Engle of GardaWorld to show the inappropriate nature of the relationship, and that Mr. Roberts was fired the next day as a result. *Id*. at 19. Plaintiff cites additional text messages between herself and Mr. Roberts in her Complaint. *Id*. at 20-24.

Relevant to the current motion, Plaintiff alleges that her termination was a "rush to judgment as a pretextual joint decision of the defendants based on a single inconclusive test for use of a marijuana test." *Id*. at 2-3. Later in her Complaint, Plaintiff alleges that Mr. Roberts "had the authority to hire, fire and discipline employees and exerted his influence over the decision to terminate Plaintiff Cooper based on the pretext of a 'failed drug test' despite Mr. Roberts' own admission to the Plaintiff of the contrary results of the test." *Id*. at 36.

Discovery has now provided further factual information regarding the drug testing referenced by Plaintiff. Plaintiff testified that she was smoking marijuana once or twice per day while she was working at GardaWorld, and acknowledges that that was a violation of GardaWorld policy. *Id*. at 16-17; ECF No. 94-4 at 13. Plaintiff testified that on August 25, 2022, Major Engle

gave her two successive drug tests, and that both results were inconclusive. (ECF No. 94-4 at 17-20). Plaintiff testified at deposition that she was upset when, just prior to her separation, Mr. Roberts allegedly told her that GardaWorld was going to treat the inconclusive test as a positive test, and use it as a basis for termination. (ECF No. 86 at 3; 86-4 at 2). On August 29, 2022, Plaintiff called Major Engle and requested a copy of her test results from the two tests, but they were not provided. (ECF No. 94-4 at 26-27). Although Plaintiff insists that Mr. Roberts told her she was fired in relation to the drug testing results, GardaWorld witnesses testified that no decision had been made to treat the inconclusive results as positive, or what, if any, action would be taken regarding the results prior to Ms. Cooper "walking off the job." *See* Deposition of General Manager Jayson Ramsey, ECF No. 94-7 at 15-16.

Important to the Court's decision making here, the test *results* from these two tests were both preserved and provided to Plaintiff in discovery, and the parties do not dispute that the results were inconclusive. Instead, Plaintiff's motion is based on GardaWorld's failure to preserve the actual swabs used to take the samples for those tests, which were apparently discarded in the ordinary course of business a few weeks after the tests were administered. (ECF No. 86-5). Plaintiff asks the Court to enter judgment in her favor based on GardaWorld's failure to preserve these swabs or, failing that, asks that an adverse inference jury instruction be given at trial. (ECF No. 86 at 8).

**II.     Analysis**

As Judge Grimm of this Court observed, "there is no general duty to preserve documents, things or information whether electronically stored or otherwise." *Victor Stanley, Inc. v. Creative*

*Pipe, Inc.*, 269 F.R.D. 497, 520 (D. Md. 2010). Rather, to be "sanction worthy" in the Fourth Circuit, the party seeking sanctions for spoliation of non-electronic evidence[2] must show:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Id.* at 520-21 (quoting *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 509 (D. Md. 2009) (quoting *Thompson v. U.S. Dep't. of Hous. & Urban Dev.,* 219 F.R.D. 93, 101 (D. Md. 2003))).

The obligation described in the first of these requirements is triggered when litigation is reasonably anticipated. *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). The duty to preserve evidence "also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id.* at 591 (citation omitted). At the same time, "[t]he mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation." *Goodman*, 632 F. Supp. 2d at 510. Rather, this duty begins "somewhere between knowledge of the dispute and direct, specific threats of litigation." *Huggins v. Prince George's Cnty.*, 750 F. Supp. 2d 549, 560 (D. Md. 2010). District courts within the Fourth Circuit have cited events such as the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim as triggers for the duty to preserve. *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 292 (D. Md. 2023).

---

[2] The availability of sanctions for the spoliation of *electronic* evidence is dictated by revised Rule 37(e), which has more precise requirements depending on the sanction sought. Fed. R. Civ. P. 37(e).

4

As for the "culpability" requirement,[3] the Fourth Circuit has explained: "[S]poliation does not result merely from the 'negligent loss or destruction of evidence.' Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). In *Thompson, supra*, Judge Grimm cited with approval the sliding scale framework regarding the type of culpability and the availability of certain kinds of sanctions set forth in *Residential Funding v. Degeorge Financial Corporation*,[4] describing three possible states of mind: "bad faith/knowing destruction, gross negligence, and ordinary negligence." 219 F.R.D. at 101 (citing *Residential Funding v. Degeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002)). He further explained that the more culpable the state of mind, the more significant the available sanction, noting, "[w]hen evidence is destroyed in bad faith (i.e. intentionally or willfully), that fact alone is sufficient to demonstrate relevance. By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." *Id*. (quoting *Zubulake v. UBS Warburg LLC,* No. 02 Civ. 1243 (SAS), 2003 WL 22410619, at *6 (S.D.N.Y. Oct. 22, 2003)).

If the first two requirements are met, the moving party must establish the relevance of the lost evidence. "In the context of spoliation, lost or destroyed evidence is relevant if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Victor Stanley,* 269 F.R.D. at 531–32 (citation and quotation marks omitted).

---

[3] Again, the Court distinguishes the general culpability standard applicable to loss of evidence generally, versus the more precise culpability standard for imposing sanctions for spoliation of *electronic* evidence is set forth specifically in Rule 37(e).

[4] With the 2015 changes to Rule 37(e), the Residential Funding framework is not applicable to spoliation of electronic evidence. *See, e.g., Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 48 (D.D.C. 2019) (finding *Residential Funding* superseded by the 2015 changes to Rule 37(e) as to electronic evidence).

Turning to the facts of the present case, Plaintiff was administered two drug tests on August 25, 2022 based on a suspicion of marijuana use in violation of company policy. Plaintiff admits that she was using marijuana at the time. Notwithstanding this admitted use, the parties agree that the results of the tests were "inconclusive," and that those results were shared with Plaintiff at the time. According to Plaintiff, she was told by Mr. Roberts that Defendants nonetheless planned to treat the inclusive test results as positive results as a pretense to fire her. Thus, shortly after her separation from employment, she requested a copy of the two test *results* from Major Engle during an August 29, 2022 telephone call.

The Court recommends that Plaintiff's motion be denied. As an initial matter, the Court has serious doubts about whether GardaWorld reasonably should have anticipated litigation at the time of the drug testing. Plaintiff points only to her request to Major Engle for her drug test *results*, combined with an offhand comment during their phone call consisting of, "oh I have to go…my lawyer is calling me" as her sole basis. (ECF No. 86 at 6-7; 86-6 at 2). Curiously, Plaintiff testified at deposition that she had not even retained a lawyer until nearly one month after the call. (ECF No. 94-4 at 7). But even if, *arguendo*, such an interaction was sufficient to trigger a duty to preserve the test *results*, the Court declines to find that GardaWorld should have reasonably anticipated litigation so as to trigger a duty to preserve the testing *swabs*.

Additionally, Plaintiff has presented no evidence that the failure to keep the drug testing swabs was anything other than Defendants' normal routine so as to establish the requisite culpability for spoliation sanctions. Nor can it reasonably be inferred from circumstances that Defendants' failure to preserve was based motivated by any desire to deprive Plaintiff of evidence, where neither party is disputing the accuracy of the "inconclusive" results. (In fact, this result, if

anything, is more favorable than Plaintiff could have expected given her admitted marijuana use during this time.)

But even if Plaintiff was able to establish the first two requirements for sanctionable spoliation, she has utterly failed to articulate the relevance of the swabs for any element of her case. She did not ask for the swabs at the time of her separation. In fact, the first time that Plaintiff requested the swabs was late in the discovery process, by email from her counsel on March 14, 2025. (ECF No. 94 at 4).

Conceivably, there may have been scenarios—such as if Plaintiff was fired based on an allegedly positive drug test when the actual test results were negative or inconclusive—that might put Plaintiff's motion on sounder initial footing. Even in that hypothetical circumstance however, such a motion would ultimately fail for a number of reasons. First, the parties do not dispute that the tests results were both deemed inconclusive. Second, the actual test results were preserved and provided to Defendant in discovery.[5] Plaintiff's current motion is instead based on Defendant's failure to preserve the swabs used in the two tests at issue, even though the parties do not dispute the test results were deemed inconclusive. As such, she has failed to establish the relevance of the swabs to any issue in dispute in the case.

Under such circumstances, the undersigned recommends that Plaintiff's Motion for Sanctions (ECF No. 86) be denied.

Dated: May 15, 2025

                                                                           /s/
                                        J. Mark Coulson
                                        United States Magistrate Judge

---

[5] Defendant offers an additional reason---that Plaintiff's separation was not based at all on the test results, although Plaintiff disputes the circumstances of her separation, claiming that Mr. Roberts told her she was fired because the inconclusive results were purportedly going to be treated by GardaWorld as positive results.