**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

Yvette Cooper                                        *
2301 North Calvert Street
Baltimore, Maryland 21218

       *Plaintiff*

vs.                                              Case Number 1:23-CV-03116

Baltimore Gas and Electric Company, et al.        *
2 Center Plaza
110 West Fayette Street
Baltimore, Maryland 21227

       *Defendants*
*******************************************************************************

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Yvette Cooper ("Plaintiff") by and through her undersigned counsel, Donald R. Huskey of the Law Office of Donald R. Huskey, L.L.C. and Governor Jackson, III of the Law Office Governor Jackson, III L.L.C. hereby file this Memorandum in Support of Plaintiff's Motion for Summary Judgment and in furtherance of their Motion state as follows:

### *Statement of Material Facts*

Plaintiff Cooper has a history of being a victim of sexual abuse, beginning when she was sexually abused by her sister from age 6 to 10. *See Exhibit 1* [Depo. Tr. of Yvette Cooper at p. 172, 173. She was also sexually abused by one of her sister's husband for approximately a year when she was in the ninth grade. *Id*. at 175. When she was 16 years old, she was kidnapped and sexually assaulted at knifepoint. *Id*. at 176.

Prior to working for the Defendants, Plaintiff Cooper was a security guard at Admiral Security for approximately a year. *Id*. at 47-49. She was terminated from Admiral, and following her termination, she received an unsolicited call from Tavon Roberts, whom she had worked with

1

while at Admiral Security. She testified, "[h]e called me and told me that he had a – a opening for a supervisor. And I told him, "That sound great. I would love to come back to work." I applied online for Garda." *Id.* at 50.

After filling out an application online, Plaintiff Cooper was interviewed over the phone by Mr. Roberts and another captain employed by GardaWorld. *Id.* at p. 132. Plaintiff Cooper was given a drug test and uniform at the GardaWorld office located in Towson, Maryland. *Id.* at p. 135. Plaintiff Cooper was hired as a "Sergeant" and responsible for supervising up to three officers on her shift at the BGE GEB Building, and was responsible for interacting with guests entering the building, communicating with maintenance and housekeeping, tending to emergencies involving guests on all floors of the building, and completing paperwork for the following shift. *Id.* at 32, 99, 136. Her assigned shift was from 7:00 a.m. to 3:00 p.m. Monday through Friday, and she would also work overtime if any of her coworkers called out. *Id.* at p. 98-99. Plaintiff Cooper also received overtime pay for any hours worked in excess of 40 hours per week. *Id.* Plaintiff Cooper reported directly to Mr. ("Captain") Roberts, who carried a gun while on duty. *Id.* at 137, 139.

Mr. Roberts' office was located inside of the BGE building, did not have any windows or cameras, and had a single door that closed automatically. *Id.* at 300-301, Mr. Roberts also consumed alcohol on duty which he kept in a duffel bag in his office. *Id.* at 298, 304, 303.

In addition to being Plaintiff Cooper's supervisor, Mr. Roberts was also responsible for approving overtime, the administration of which was being abused by Mr. Roberts and other managers in 2021 when Plaintiff Cooper was hired. *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 28]. At the time of Plaintiff's hire, Defendant GardaWorld had a policy against sexual harassment (defined as unwanted sexual advances, requests for sexual favors, or visual, verbal,

or nonverbal or physical conduct of a sexual nature) which was considered inappropriate conduct even if it was consensual. *See Exhibit 3* [GardaWorld Policy Against Sexual Harassment]

Despite this policy, however, according to Jayson Ramsey, GardaWorld's General Manager during Plaintiff's tenure, in 2021 and 2022, there were no direct or explicit steps or guidelines or written directives or protocols that set forth what was to occur during an investigation of sexual harassment, nor was there any mechanism in place to track the progress of any such investigation. *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 43, 44.]. Indeed, even when Mr. Ramsey received an email in March 2022 advising that Mr. Roberts had exhibited inappropriate behavior towards other female GardaWorld security employees, Mr. Ramsey unequivocally testified that he did nothing to independently investigate the complaint he received, and even went so far as to select Mr. Roberts as an "Employee of the Month" in April 2022 with full knowledge of the complaints levied against Mr. Roberts. *Id*. at 49-50. Mr. Ramsey testified:

> "Q: If you look at your prior exhibit, the date of the email that you received from Roy Engel referring to Mrs. Butler's complaint was dated March 31, 2022. The date of this submission of the GardaWorld nomination form is April 30, 2022. And so my question, based on your testimony about your involvement in selecting the nomination form, is this; were you concerned, as a general manager, of selecting Mr. Roberts as the nominee for this award based on only in the prior month receiving notice of allegations from female employees stating or alleging that Mr. Roberts made her feel uncomfortable? Did that not concern you as a general manager?
> MS. ABRAHMS: Objection. You can answer.
> A: Wouldn't have crossed my mind." *Id*. at 54-55.

Based on Mr. Roberts' supervisory status during Plaintiff's tenure, Major Engle testified:

> Q: So it would be fair to say that Captain Roberts should not have had a sexual relationship with anyone reporting– that reported to him of which he would be able to give overtime, right?
> A: That'd be correct." *See Exhibit 4* [Depo. Tr. of Roy Engel at p. 42-43]

Also, Jayson Ramsey, GardaWorld General Manager at the time of Plaintiff Cooper's employment, testified that *even if consensual,* such a relationship would be a violation of company policy because [Captain Roberts] was a supervisor of that officer directly. *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 108-109].

The sexual harassment perpetrated against Plaintiff began almost immediately upon her tenure as Plaintiff testified:

> "Q: And when was this?
> A: This was when I was working for GardaWorld. I was called back in the office. I was talking to him about a 401(k) plan to see if – you know, what I had to do as far as to sign up for it or whatever.
> Q: Mm–hmm.
> A: The end of that conversation, he came over to me and was like, "You look real good." And he groped my butt first, then he groped my breast. After that I was in shock. I left out the office really quickly and I went back to my desk and sat down. *See Exhibit 1.* at p. 31-32.

Plaintiff Cooper did not report this incident to anyone at BG&E or GardaWorld because she was afraid that she would lose her job. *Id.* at 315. She explained:

> "Q:What was the basis of you feeling that you could still lose your job even if you made an anonymous complaint?
> A: I don't know. I just felt like it would come back on me some kind of way, form or fashion, cause Major Engel handpicked Captain Roberts. So if I would go against Major Engel then I know definitely I wouldn't have a job.
> Q: How do you know that Major Engel handpicked Captain Roberts? And are saying handpicked Captain Roberts to do his job?
> A: Yes.
> Q: How do you know that Major Engel handpicked Captain Roberts?
> A: Sergeant Wiley told me." *Id.* at 316."

The sexual harassment continued, resulting in Mr. Roberts propositioning Plaintiff with a *quid pro quo* offer of overtime pay in exchange for sex, as Plaintiff testified:

"Q: So he would pick you up at home for what? For what purpose?

A: To take me to his home.

Q: Okay. And for what purpose?

A: For sexually.

Q: To have sex?

A: Yes.

Q: Is– so this is late November 2021, so you were having sex with Mr. Roberts at this point; correct?

A: Yes.

Q: When did you start having sex with Mr. Roberts?

A: I can't remember the exact date–

Q: Okay.

A: – Mr. Roberts asked me to come into his office.

THE REPORTER: Sorry. Could you repeat that entire answer?

A: Mr. Roberts– Mr. Roberts asked me to come into his office. At that time we were talking about something about– as far as the business and BG&E, about people coming in. We finished discussing that, and he told me to come over to him. He proceeded to– he proceeded to put my face in his groin area and made me perform– made me perform a sexual act on him until he ejaculated in my mouth. After that I cleaned my mouth, wiped my face. He told me if I keep it up, I won't have to worry about having overtime. I left out his office and I proceeded to the bathroom, where I cried and wiped my face and went back to my desk."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q:Did he react in any way after he did it, either physically or by saying anything?

A: Yes.

Q: What did he– how did he react?

A: He was like oh.

Q: Like a moaning sound?

A: Yes.

Q: Did he say anything audible?

A: He told me if I keep this up I won't have any problem with getting all the overtime that I want." *Id.* at p. 70-71;324-325.

Plaintiff Cooper and Mr. Roberts communicated via text message during her employment. *See Exhibit 5* [Text communications]. Plaintiff testified as follows regarding the vile nature of the comments and innuendo made by Mr. Roberts via text message:

"Q:If you look at the next text string– it's at the bottom of the page that you're on,

November 28, 2021— Mr. Roberts says to you (as read) "I want to try what I was saying on you so bad right now." Then the next message: "My feet on fire right now, how I'm thinking into church.." What was it that he wanted to try on you?
A: I don't recall.
Q: It's fair to say that sounds like a sexual act?
A: Probably, mm-hmm.
Q: And then it looks like you responded (as read) "You going– you going straight to hell." Is that you in the blue?
A: Yes."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Then the next day, November 29, 2021, Roberts texts you (as read) "But I do have to write you"-- and then it says "UO". "When you get here, it will be on my desk." What does that mean? Do you know?
A: No.
Q: Okay. Then the next page– well, actually, you respond "Huh." Do you see that?
A: Yes.
Q: Then he says (as read) "I just need to dip my pen in your ink." Do you know what that means?
A: Yes.
Q: What does that mean?
A: He wanted to have sex with me."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Okay. And then he responds (as read) "After I can take you home. In the morning I need to feel that pussy juicing on this stick. Got frustration to take out. You will orgasm better than that vid you sent." So first of all, he's referring to a video that you sent; is that correct?
A: That's what he said.
Q: Did you ever take a video of yourself and send it to him?
A: Not to my knowledge."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: How many times did you go to his house?
A: Approximately about three to four times.
Q: And did you have sex every time?
A: Yes."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Then the next message is December 16, 2021. So it's very hard to read this because of the way that arrow and the screenshot. (Simultaneous speakers.)
A: Yeah.

> Q: It looks like (As read) " I'm—I'm a need you to"--something— "them cheeks for me when you get back." Do you know what that says?
> A: I understand it just like you just said it.
> Q: What– when he says "cheeks," what do you — what is that referring to?
> A: My buttocks.
> Q: Okay. What specifically sexually is he referring to, do you know, with respect to your buttocks?
> A: Kiss them."
> *See Exhibit 1* at p. 72, 75, 76-77, 84, 85-86.

Mr. Roberts also gave Plaintiff Cooper a Christmas card with fifty dollars inside of the card as an unsolicited gift. *Id*. at p. 87.

In January 2022, Mr. Roberts sent Plaintiff Cooper a text message telling her that "he wanted [her] to ride him [a]nd meet him in his office" *Id*. at 327. In response, Plaintiff Cooper went to Mr. Roberts' office and she further described the incident as follows:

> "Q: For this particular act, was he seated on his side of the desk?
> A: Yes.
> Q: Were you seated on your side of the desk before the act?
> A: Yes.
> Q: How did you— how did the act begin?
> A: He told me to come here. And I walked towards him. And he started kissing me and unbuttoning my shirt.
> Q: Did he grab you anywhere?
> A: No. He just— no. He just turned me around and made me sit on top of him.
> *Id.* at 328

Also, in January 2022, Plaintiff Cooper told Mr. Roberts that she did not want to be his sexual partner given his sexual relationship with another GardaWorld employee, as Plaintiff testified:

> "Q: Then on January 5, it looks like (as read) "So you don't need me for tomorrow." And he says (as read) "Why not, baby?" And you say (as read) "I just need to keep my cookies to myself. I don't like sharing." Do you see that?
> A: Yes.
> Q: And you're asking him, he doesn't need you for tomorrow sexually; correct?
> A: No, that was for a shift.
> Q: Okay. But then you say (as read) "I just need to keep my cookies to myself.""

Are you referring to your sharing sexual experiences with him?

A: Yes.

Q: And you're telling him that you wanted to be his only partner, correct?

A: Yes.

Q: So what prompted this text message here?

A: I had a conversation with a coworker, and she told me that Mr. Roberts was also having a relationship with Sergeant Morrison. So– and she told me to be careful. So that's what that mean. I don't— I don't— I told him that I didn't want to be in a relationship with him or — you know, and no sexual favors at all.

*************************************

"Q: Do you know if he had a romantic relationship with Ms. Morrison while they were at Admiral?

A: Yes.

Q; When did you know that?

A: They would be in– it's like a closet next to our station where everyone has to come and put their time in on each shift. It's plenty of times that they would be coming out of there together smelling like alcohol." *Id*. at p. 48;89-90, 91.

The lewd text messages predominantly initiated by Mr. Roberts continued in 2022, as Plaintiff

testified:

"Q: January 25 there is a— an embedded video. Do you see that?

A: Yes.

Q: It looks like two dogs giving each other oral sex. Do you see that?

A: Yes.

Q: Did he send that? Or did did you send that?

A: He had to send that."

*************************************

"Q: Then at the top of the next page, which later in the text thread has February 3 as the date, it says "Attachment unavailable." Do you know what attachment that was?

A: No.

Q: And he says (As read) "GM, baby" to you. And he says (as read) "Can he have a kiss win"---- W-I-N— "the get back?" Is he saying can he have a kiss when you get back?

A: I have no idea.

Q: And you say (as read) "Of course"; right?

A: Yes.

Q: And did you kiss him on February 3?

A: I have no recollection of that.

Q: Then February 3 he tells you to (as read) "Stop playing with that pussy." Do you know why he said that?
A: I have no idea." *Id.* at p. 97, 98.

On or about February 11, 2022, to continue access to overtime shifts, Plaintiff Cooper invited Mr. Roberts via text message to Cancun for a vacation, to which Mr. Roberts responded "I will definitely try". *Id*. at 103. However, the trip never occurred. *Id.* Plaintiff Cooper, in a further attempt to continue access to overtime shifts, sent Mr. Roberts a photograph of herself clothed and smiling via text message, to which Mr. Roberts responded sexually, as she testified:

"Q: And then going to the next page, this is March 29. Do you know where your– the text messages are from February 18 to March 29 of 2022?
A: No.
Q: And this is a picture of you; right?
A: Yes.
Q: And you sent it to Mr. Roberts?
A: Yes.
Q: Would you agree that it's a – an attractive picture of yourself?
     MR. JACKSON: Objection. You can respond.
A: Yes, I guess.
Q: You're smiling. It's a nice picture.
A: I think it's a nice picture.
Q: Yeah. And then he says (as read) "Just tell me, 'Put the towel under my ass, please." What did he mean by that?
     MR. JACKSON: Objection. You can respond.
A: I have no idea what he meant." *Id*. at p. 107-108.

In March 2022, Defendants were placed on actual notice of Mr. Roberts' offending behavior based on a public verbal tirade by a terminated employee, Officer Butler, on the premises of Defendant BGE's GEB building. Plaintiff Cooper testified:

Q: And then what happened after she threw the phone and hand sanitizer?
A: She walked out of the building. And she came back in and told the lady that Worked for the 14th floor that ya'll think that it's all gravy in here, but Captain Roberts is F'ing Morrison.
Q:Did you also hear this comment made on the videotape you watched?
A: No, I didn't hear it.

> Q: So how were you made aware of that comment that she made about what was going on in the office?
> A: Morrison told Sergeant Wiley what happened and Sergeant Wiley told me what she said. And I watched it.
> Q: Watched what?
> A: I watched the whole incident.
> Q: Where did you watch it?
> A: On the camera, on the desk right there where I sit at.
> Q: Did the video have sound?
> A: No.
> Q: So if it didn't have sound, how did you know what was being said on the video as you were watching it?
> A: Because Officer Butler told me. She called me as soon as they fired her. She was really, really hurt."
> *Id.* at 288–289

On March 31, 2022, an e-mail regarding this incident was sent from Major Engle to Jayson Ramsey and other GardaWorld and BGE managers and supervisors referencing inappropriate behavior by Mr. Roberts of which Officer Butler had a video. *See Exhibit 6* [E-mail from Major Engel re Shanira Butler]. Plaintiff's expert witness Kevin Clark, former Chief of Police for the Baltimore City Police Department, testified as follows regarding the Defendants having actual notice of Mr. Roberts' sexually offensive behavior based on Officer Butler's complaint and failing to take any corrective action:

> "But on March 31st there is an incident that occurs with an employee, I think Shanira Butler, where she's being— giving her two weeks notice. And at that point it gets violent in the lobby and she more or less exhibits physical and verbal threats towards another employee, Morrison. This occurs in the lobby of the corporate building of BG&E. At that point, based on what occurred, Major Engel became involved, was brought into the situation and had an interview with Ms. Butler. And Ms. Butler advised- put GardaWorld on notice at that point that she felt uncomfortable and she thought some of Mr. Roberts' interactions were inappropriate, and she actually had tangible evidence. She said she had a video.
> She told this directly to Major Engel, who under policy, sexual harassment policy and the code of conduct by GardaWorld, and consistent with the sexual harrassment policies all GardaWorld employees working for BG&E were required

to take under sexual harassment, he was required to immediately initiate an investigation and communicate with HR or chief of HR to ensure that reasonable care or the standard of care that these employees were supposed to be afforded to be safe and free from sexual harassment within their workplace, was commenced.

He did nothing. What they did is they terminated the employee and there was no followup. He told the terminated employee at this time they had to take all of that to HR on their own. Direct violation. But they were on notice at that point… And also there's an email on March 31st authored by Mr. — by Major Engel. And in that email he references what occurred on that date. And if I recall, in that email it was also forwarded to managerial-level people at BG&E. So they were also on notice and— of what had occurred and what the allegations were in the— in the report made by Ms. Butler, who was being terminated."
*See Exhibit 7* [Depo. Tr. of Kevin Clark at p. 157-160]

Plaintiff Cooper and Mr. Roberts continued to be sexually intimate until July 2022. *See*

*Exhibit 1* at 119. Plaintiff Cooper testified:

"Q:Then if you go down, July 15, it says— the text is cut off, but I think what it says is (as read) "You asked for some pussy, but I have to decline. As long as you fucking Morrison, I can't be involved." Do you see that?
A: Yes.
Q: And that's your text to him; correct?
A: Yes
Q: So what prompted you saying this? Did he ask you to come and have sex with him?
A: Most likely, yes."
********************************
"Q: So the text where you said that you had to decline to– having sex with him on July 15, did you have sex with him at any point after July 15?
A: No." *Id*. at p. 116-117, 119.

In August 2022, Major Engle received complaints from two BGE staff members that said

"they had talked to Cooper about coming off the elevator, smelling marijuana." *See Exhibit 4*

[Depo. Tr. of Major Engle at p. 44]. On August 25, 2022, Plaintiff Cooper was given a drug test

as described by Major Engle:

"Q: Where was she given a drug test?
A: At the GEB.

Q: And is there a location in GEB where she was given the test?
A: Yes, and in the captain's office or the shift supervisor office.
Q: And why was she given the test?
A: Because there had been complaints from two BGE staff that they had said they had talked to Cooper about coming off the elevator, smelling marijuana, approached her. And their story, it's just to notify her that they could smell it and it was probably a bad idea."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Okay. Is there a laboratory at the BGE site that's a drug testing laboratory?
A: No, sir.
Q: Do you have any medical training?
A: I do not.
*See Exhibit 4* [Depo. Tr. of Roy Engel at p. 44, 46]

Plaintiff's expert witness Kevin Clark, former Chief of Police for the Baltimore City Police Department, testified that the smell of marijuana does not provide reasonable suspicion to administer a drug test. *See Exhibit 7* [Depo. Tr. of Kevin Clark at p. 118]

Major Engle further testified that to his knowledge, prior to administering the mandatory drug test, there were no witnesses who reported seeing Ms. Cooper smoke marijuana, there was no search of Plaintiff Cooper's person to confirm her possession of marijuana, nor did Major Engle observe Plaintiff Cooper exhibiting any unusual behavior or appearance that would lend credence to the accusation that she was under the influence of marijuana. *Id*. at 48, 70. Moreover, Mr. Ramsey, whom Major Engle consulted with regarding the administration of the mandatory drug test and interpretation of its results, testified that despite the handbook requiring 'reasonable suspicion' to be present to render a drug test, he was of the opinion that "having a hunch about an employee being under the influence of drugs" and "having a reasonable suspicion about an employee being under the influence of drugs" were "one and the same." *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 64].

The administration of the mandatory drug test was a violation of Maryland statutory law and a criminal offense. COMAR 10.10.10.10 states "[a]n employer who for job-related reasons requires an individual to be tested for alcohol or controlled dangerous substances shall (A) have the specimen tested by a laboratory that holds a Maryland license in the discipline of job-related alcohol and controlled dangerous substances testing, and (B) at the time of the testing and at the individual's request, inform the person of the name and address of the laboratory that will test the specimen. *See Exhibit 8* [Plaintiff's Answers to GardaWorld's First Set of Interrogatories at p. 13]. Nevertheless, the illegal drug test was administered as described by Plaintiff Cooper:

> "Q: And Mr. Engel gave you the sealed drug test and you swabbed your own mouth, correct?
> A: Yes.
> Q: And then Mr. Engel asked you to swab it again?
> A: After I went and sat down at my desk, he called me again back to the office 'cause he told me it wasn't enough spit inside of the container for, you know, I guess to go around for everyone to be complete. So after I swabbed my mouth I went and sat to my desk, he called me back in the office and said there wasn't enough saliva. So I put it back in my mouth and put some more salvia on the test, and then he said okay."
> Q: Okay. And you were told the result of the first test?
> A: He told me that it– he had to wait for it actually to come back.
> Q: Okay.
> A: And after it came back, he told me that I had to do another one, that it was inconsistent.
> Q: How long after the first did you do the second test?
> A: I want to say about 30 minutes later. Because he went to go get it and came right back to the office."
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: And did you see the test results as they came in?
> A: Yes.
> Q: And what did they come in as?
> A: Both of them inconsistent.
> Q: Inconclusive?
> A: Inconclusive, I'm sorry.
> Q: No, that's fine. And Mr. Engel told you that he needed to talk to others at GardaWorld about what the next steps were, correct?

A: Yes." *See Exhibit 1* at p. 221-224.

Mr. Ramsey did not communicate with Plaintiff Cooper about the results of the mandatory drug test, despite being of the opinion that the results were inconclusive. *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 72, 113-114]. Also, prior to Ms. Cooper, Mr. Ramsey had never received any training on how to perform a mouth swab, nor had he previously interpreted the results of a mouth swab.[1] *Id.* at p. 82. Mr. Ramsey was also unaware of any requirements by the State of Maryland for drug testing of employees considered to be under the influence of narcotics. *Id.* at p. 88. Mr. Ramsey was also unaware of what happened to the test after it was administered or whether Mr. Roberts had access to the test following its administration. *Id.* at 102. Ran Muhanand a physical security specialist assigned to the BG&E Building in which Plaintiff Cooper worked (i.e. "the "Gas and Electric Building"), also testified that he was not aware of the presence of any certified laboratory on the premises of the GEB building for the purpose of testing the presence of marijuana. *See Exhibit 9* [Depo. Tr. of Ran Mahanand at p. 77].

On August 26, 2022, Plaintiff's last day of employment was described as follows:

> "Q: What happened on the 26th?
> A: The 26th, I came in for work, a normal day, I got a call from Captain Roberts stating that he needed to talk to me. He came out to my desk. He pulled me into the office that is right in front of my desk with him, Engel, I can't think of the other guy's name, but it's like a meeting that they have every morning with all the captains so he was on the phone with him muted. But I gave—
> Q: Who was on the phone?
> A: Captain Roberts was on the phone with the rest of Engel and the rest of the team as far as the captains is concerned, like all the captains get on the phone

---

[1] During Mr. Ramsey's discovery deposition, Mr. Ramsey was shown photographs of all of the drug tests administered to Plaintiff Cooper and was unable to identify which photograph showed a "failed" drug test ("Q:..What I'm asking you to get clarification on is to ask which one of these photos that you were referring in this email where you respond, looks like a failure to me. A: I don't know."). *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 91.]

every morning and have they, I guess, I don't know, a meeting or whatever. So he pulled me in the office that's right directly in front of mine, and told me that, you know the two drug tests that you took yesterday? I said yeah. He was like, well, they're going to use them as positives. And I did like this, like how is that possible, they can't use a negative test as positives. He said, Engel and– I cannot think of the other name, man name– Engel and whatever the other guy name is, said that they were going to use them as positives and that , you know, basically I don't have my job anymore. ***So I said I'm fired? He said basically you're fired.*** So I walked out of the office that we two were in, I went around the corner and grabbed some of my belongings, I went outside in the BG&E hall, I smoked a cigarette, I came back in, I grabbed all my belongings and told my officer it was nice working with him and then I left."

**************************************************

"Q:And nobody authorized you to leave before the end of your shift, correct?
A: No, that's not correct. Mr. Roberts told me I was fired.
Q: Did he tell you to leave before the end of your shift?
A: If I'm fired, I mean you need to leave."
*See Exhibit 1* at 226-227; 230-231 (emphasis added).

She was terminated from employment on August 26, 2022. *Id* at p. 32. On August 27, Plaintiff Cooper called Human Resources and left a voicemail, but there was no response to her call or her voicemail. *Id*. at 238. Plaintiff Cooper spoke with Major Engle about the circumstances surrounding her termination, as Plaintiff described as follows:

"Q: So did you– so what do you mean ask about your job?
A: Ask him, you know, what was the determination about everything that went on. I told him what I was told by Captain Roberts and he said that Captain Roberts wasn't supposed to tell me that him and— I cannot think of the general manager's name of GardaWorld, John something, I think, I don't know exactly his name.
Q:Jayson Ramsey?
A: Jayson, there you go. He said– I told him that Captain Roberts brought me into the office and told me that him and Jayson was going to use the inconclusive test as positives. He said Captain Roberts wasn't supposed to even let you hear that conversation on the phone. I said, well, he did, so that's why I left because he told that you were going to use those inconclusive tests as positives. And he said to me, you know what that means, you're fired. That's what Tavon Roberts said to me. So I got my stuff and I left the building. This is exactly what I told Mr. Engel,

Captain– Major Engel. And Major Engel said to me, Captain Roberts wasn't even supposed to allow you to hear our conversation."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q: I'll strike that. We'll move on. Did you discuss anything else during your call with Mr. Engel?

A: He said to me he didn't understand what's going on. And I told him that there was a lot of confusion at the workplace because of Mr. Roberts. And he said what do you mean? And I told him that he was having a sexual relationship with me, Morrison and I can't think of the other lady name." *See Exhibit 1* at. 238-240; 247

Major Engle described his conversation with Mr. Roberts following Plaintiff Cooper's revelation of his sexual harassment of the Plaintiff, and Major Engle described his conversation with Mr. Roberts as follows:

"Q:Did you make any notes of your conversation with him?

A: I did not.

Q: Did you record (inaudible) statements to you?

A: I did not. I—

Q: Did you— go ahead.

A: It was a very brief conversation. So I also included that into my note to my boss. And it simply stated that when I got there, he had already removed his belongings from the office. He apologized to me for taking advantage of the situation and handed me his BGE work badge.And he gathered the few things that he had left in the office and walked out." *See Exhibit 4* [Depo. Tr. of Roy Engel at p. 55-56]

Plaintiff's expert witness, Kevin Clark, opined as follows:

"What I saw here at this point, I saw that Tavon Roberts, who was a supervisor and had the ability to significantly impact her work, and meaning he was in control of everything going on, that he was in complete violation of GardaWorld's and BG&E's sexual harassment policies in his actions with Ms. Cooper. All of this conversation takes away from what the core- what the core complaint is here, that we have a supervisor who was involved in sexual harassment in the work environment, and that it became so pervasive in the workplace and severe against Ms. Cooper that it became abusive and she was intimidated to the point that it affected her ability to work.

This is a clear case that Mr. Roberts was in violation of policy. Whether she thought that it was consensual, which  it is not allowed per the policy and all

of this other testimony we are— I was not drifting away in my opinions from what essentially was going on here, and factually. That we had a captain who, in my opinion, was negligently placed in control of the site. Reasonable care was not used when he was hired and appointed to that position. That GardaWorld did not take the caution and concern to look at he did not not have any managerial experience or any managerial background and he was elevated beyond even the most basic supervisory position to a site manager.

And no one at BG&E challenged putting him in a place of a — of a location that I believe was quoted as critical infrastructure. They didn't challenge his appointment as lack of managerial background. And as a result of that negligence, he was allowed to violate the policy and to sexually harass Mrs. Cooper during- throughout her employment. And when she failed to comply they retaliated, and she was fired, as were other females who attempted to report his activities." *See Exhibit 7* [Depo. Tr. of Kevin Clark at p. 151-153].

On August 29, 2022, Major Engel sent an email to Jayson Ramsey affirming the inconclusive result of Plaintiff Cooper's drug test for THC, and confirming Mr. Roberts' sexual involvement with multiple GardaWorld employees. *See Exhibit 10* [Email from Roy Engel to Jayson Ramsey dated August 29, 2022]

Though the Defendants have maintained in this litigation that Plaintiff Cooper was not terminated but rather "abandoned her post", Mr. Ramsey testified that there was never any discussion between him and Major Engel about whether or not the circumstances under which Ms. Cooper left the premises after receiving the results of the drug test constituted an abandonment of her post. *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 107].

Due to the harassing behavior of Mr. Roberts, Mr. Ramsey described the working environment as "toxic" in his written communications with GardaWorld's Humans Relations office, testifying as follows:

"Q: The third sentence in that email states, sounds like multiple staff members, which has created a toxic environment. Why did you use the term toxic environment?
A: He confirmed he had relations with the staff members, sounds like multiple

staff members. So whenever you have lovers quarrel in situation [sic[, that's going to create a toxic work environment.

Q: Do you know how many staff members when you use the term multiple?

A: I do not." *Id.* at 111.

Following Plaintiff's termination, she continued to be harassed by Mr. Roberts as she testified:

"Q: Okay. Then on the next page, it says Friday, September 9, (as read) "Don't care about the past bullshit 100%. Got to the clinic and get checked, please." That's from Mr. Roberts to you; is that right?

A: Yes.

Q: And is that he wanted you to get checked for an STD?

A: I guess.

Q: And you did, in fact, go get checked for an STD?

A: Yes." *See Exhibit 1* [Depo. Tr. of Yvette Cooper at p. 67.]

She also testified that "after I left the job, he began to threaten me on Facebook Messenger, calling me a snitch, things of that nature. So I blocked him." *Id.* at 59-60. Mr. Roberts also sent Plaintiff Cooper a picture of his penis because she refused to answer any of his phone calls after her separation from the Defendants. *Id.* at 182.

Following her separation, Plaintiff Cooper mitigated her damages by filing for unemployment, but her request for unemployment was denied. *Id.* at 37, 44, 46. Ms. Cooper is not currently employed, and was previously living on the income derived from taking care of her mother as her power of attorney prior to her mother's passing *Id.* at p. 23-24. While Ms. Cooper was a caregiver for her mother, she continued to mitigate her damages by looking for other jobs, including those in the field of security, but did not receive any return calls for interviews. *Id.* at p. 27.

Plaintiff Cooper currently has a fear of working with men, and in particular working with men who are deemed to be her supervisor. *Id.* at 346-347. She further described her emotional state following her termination as follows:

"Q: And how have you avoided such dating— have you avoided such dating relationships since your termination from GardaWorld and BG&E?

MS. ABRAMS: Objection.

A: Yes. I stay home. I'm not a people person like I used to be. I'm not as outgoing as I used to be. I'm more standoffish. I stay at home more. I don't even go out anymore. Even when I'm home and I have to go to sleep, I have to lock my bedroom door because I don't feel safe in my home.

Q: What do you not feel safe from? What is the danger that you do not feel safe from when you're at your home?

A: I feel— to be honest, I feel like this man, Mr. Roberts is always around. I'm always scared because I know that he has guns. He shown them to me. So I'm afraid he knows where I live still. I still live in the same apartment complex that he dropped me off at. So every time I come out my door, I'm so– l look first. I have a dog that I have to walk every morning. And I have to be afraid of walking her outside. I have to be afraid of coming out my door, period."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q: Do you still have nightmares about being assaulted by Mr. Roberts?

A: Yes.

Q: How frequently do you have these nightmares? Such as every night? Twice a week? Twice a month?

A: Twice a week, sometimes once a week.

Q: Do the nightmares cause you to wake up at night?

A: Yes.

Q: Are you able to go back to sleep after you wake up after having these nightmares?

A: No, sir." *Id*. at p. 349-350; 351-352

As a result of the Defendants' conduct, Plaintiff has suffered and will continue to suffer extreme mental and psychological damage, pain and distress as diagnosed and attested to by Angela Lawson, Ph.D. *See Exhibit 11* [Expert Report of Angela Lawson, Ph.D.]

### *Legal Standard*

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a); <u>Celotex Corp. v.</u>

<u>Catrett</u>, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also <u>Iraq Middle Market Development Found. v. Harmoosh</u>, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).the moving party may show that it is entitled to summary judgment by citing to evidence in the record. And, "the burden on the moving party may [also] be discharged by `showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325, 106 S.Ct. 2548; *see also* Fed. R. Civ. P. 56(c)(1)(B).

***Legal Analysis***

**A.      Defendant BGE is jointly liable under Title VII.**

Two parties can be considered joint employers and therefore both be liable under Title VII if they "share or co-determine those matters governing the essential terms and conditions of employment."  <u>Butler v. Drive Automotive Industries of America, Inc., et al</u>, 793 F. 3d 404 (2015); *See also* <u>Bristol v. Bd of Cnty, Comm'rs</u>, 312 F.3d 1213, 1218 (10th Cir. 2002). In other words, "courts look to whether both entities 'exercise significant control over the same employees." *Id*. Specifically, the Fourth Circuit as consistently adopted and applied the "hybrid test" in Title VII cases, which evaluate the following factors in assessing whether an individual is jointly employed by two or more entities: (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative

employer furnishes the equipment used and the place of work; (4) possession of and responsibility for over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship. *Id*. None of these factors are dispositive and the common law element of control remains the principal guidepost in the analysis. *Id*.

Here, there is no genuine dispute of the material fact that Plaintiff Cooper was assigned solely to Defendant BGE, and Defendant BGE was involved in the day-to-day supervision of Plaintiff Cooper and other GardaWorld employees given Defendant BGE's determination of the post orders followed by GardaWorld employees, and the formal training provided by Defendant BGE to GardaWorld employees. Major Engle testified:

> "Q:What would have been Ms. Cooper's responsibility with respect to the three employee she supervised?
> MS. ABRAMS: Objection. You can answer.
> A: Making sure that they were following the post orders that are assigned to that building and that particular post that they were on.
> Q: Now, Major, when you said post orders, are the post order something that is there standing order, or is there something that's like a roll call order that's given like to police officers every day?
> A: So post order is something that is generated by the BGE security team for the contract security company to follow. Standing order would have been the — or view call- roll call would have been the daily pass down. So as one sergeant comes in, they pass down what happened the evening before or any notes that were given to them to the next sergeant and so on throughout the day."
> *******************************************
> "Q:Were you an instructor for an all hands meeting with GardaWorld and BGE in the spring of 2021?
> A: Yes.
> Q: Okay. What did that training involve?

MS. ABRAMS: Objection. You can answer.
A: I believe it— recall the issue at hand was we were mitigation. So we discussed with the officers helping out on extra shifts, keeping up on their training. ***I do believe we had BGE step in and do a run/hide/fight/video from DHS the newest one, and co-employment issues.*** " *See Exhibit 4* [Depo. Tr. of Roy Engel at p. 16, 33 (emphasis added)]

Major Engle further testified that Defendant BGE required Defendant GardaWorld to operate in a paramilitary fashion, as he testified:

"Q: Would you tell me why there are rankings in your civilian organization?
A: The BGE Exelon contract requires us to have ranking so that we know who is in charge of the said shift. So a sergeant is a shift supervisor, a captain is a site supervisor, and the major is the project manager, which oversees all the BGE contract sites." *Id*. at 12-13.

Additionally, during Plaintiff Cooper's employment, she was required to take training courses given by GardaWorld and BGE on preventing sexual harassment for which she received certificates of completion. *Id.* at 149. Moreover, Defendant BGE ("Exelon") required all GardaWorld personnel to take the sexual harassment training course annually to maintain their badge and "good standing with Exelon." *Id.* at 13-14. Pursuant to the third factor of the "hybrid test" Defendant BGE furnished the equipment used to complete the required sexual harassment training as Plaintiff Cooper testified:

"Q:You were shown printouts of a module that you took that was offered by BG&E regarding sexual harassment and it showed the completion, et cetera. Do you remember discussing that?
A: Yes.
Q: Where did you take that module?
A: On BG&E property.
Q: Where?
A: At my desk.
Q: Okay. Was it– it on a computer obviously; correct?
A: Yes.
Q: Okay.
A: It was an Exelon computer." *See Exhibit 1* at p. 330-331.

This third factor, where and how the work takes place, is valuable for determining how similar

the work functions are compared to those of an ordinary employee. <u>Butler</u> at 415.

Ram Mahanand, a physical security specialist assigned to the BG&E Building in which

Plaintiff Cooper worked (i.e. "the "Gas and Electric Building"), testified as follows regarding the

joint responsibility of GardaWorld and BGE:

> "Q:In your capacity as a physical security specialist in 2022, were there any job duties or functions of a GardaWorld employee that they could not perform without your authorization or permission? For example, accessing a particular part of a building, accessing a computer, anything of that sort? Was there any part of their job, to your knowledge, that they could not perform without your authorization or permission?
> MS. WHITE: Objection.
> MS. ABRAMS: Objection.
> Q: You may answer.
> A: Again, that's not my responsibility. That comes from the security—the director of security, excuse me.
> Q: Okay. Who was the director of security who you are referring to in 2022?
> A: Wayne Mullaney.
> Q: Was he the director of security in 2021?
> A: Yes and no.
> Q: Can you explain that answer, please?
> A: Yes. We had a former director that was transferred to another organization within BGE, and Wayne came in towards the tail end of '21, I believe."*See Exhibit 9* [Depo. Tr. of Ran Mahanand at p. 25-26.]

Mr. Mahanand further explained the extent to which Defendant BGE exercised control over

Defendant GardaWorld employees as follows:

> "Q:And why did you request Mr. Roberts to provide you a weekly status update of this sort?
> A: We had a weekly meeting with– or the captains from GardaWorld.
> Q:Who would be in that meeting on a weekly basis?
> A: All the captains from Garda, along with Wayne Mullaney, Carlos– our manager, myself, and the other two security specialists."
> *************************************

"Q:So it would be you, Carlos Moscoso, all of the captains from GardaWorld, Wayne Mullaney?

A: Yes. And the other security specialists.

Q: For BGE?

A: Yes.

Q: Who were they in January of '22?

A: Greg Utz (phonetic) and Garrett Keene.

Q: And what would occur during these weekly meetings?

A: Status of everything that was going on or of significance at each of their- each of the captain's location."

Q:  Okay. Would this be essentially a request from the members of BG&E present that you just listed to the captains, asking them to report to you what activity was going on?

A: Yes.

Q: Okay.

A: Also in those meetings would be Roy Engel, Major Engel and, at the time, I believe, Jayson.

Q: Ramsey?

A: Yea. But again, sometimes he was there; sometimes he was not. I—-

Q: How long would the meetings last?

A: It was scheduled for an hour.

Q: And what was the format of the meeting?

A: We would go to each of the captains where they would give a status report, a weekly or in the past week, anything similar to this, anything significant occurring at their buildings. And then the security specialists would go in and add anything that they have."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: To your knowledge, did these weekly meetings happen up to and through the termination of both Mr. Roberts and Ms. Cooper?

MS. ABRAMS: Objection. You can answer.

A: The meetings are still ongoing." *See Exhibit 9* [Depo. Tr. of Ran Mahanand at p. 10, 58-60; 63.

Major Engle further confirmed the extent to which Defendant BGE exercised control over

Defendant GardaWorld employees as he testified:

"Q:What would have been your interaction with Mr. Muchammad in 2022? Did you meet with him?

A: On occasion, when needed.

Q: What would typically would you have to meet with him for?

A: If he had any information of projects that were going on in the building. Maybe complaints that he have had about our staff that he needed to have taken care of or need me to address that he didn't feel that maybe the captain was addressing at the time."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Do you have an IT support team there at that site?

MS. ABRAMS: Objection.

A: We do not. Garda does not. And these aren't Garda issued computers. These are BGE computers." *See Exhibit 4* [Depo. Tr. of Roy Engel at p. 25, 58]

Jayson Ramsey also testified about the joint-employer status between the Defendants as follows:

"Q: If you go to the front of that exhibit, your email to Sue Ferguson dated August 30, 2022 at 8:20 a.m. you state, we have a mess on our hands at BGE. What were you referring to with that statement, sir?

A: If you continue to read, permission to terminate Captain Roberts from BGE after he confirmed he had relations with the staff member.

Q: Is that the mess that you were referring to?

A: Yes.

Q: And why did you characterize it as a mess?

A: Because we have a supervisor engaging with multiple employees.

Q: Why did you use the terms at BGE?

A: That's where they work." *See Exhibit 2* [Depo. Tr. of Jayson Ramsey at p. 110-111].

Mr. Ramsey also testified that he agreed that in 2021 and 2022, employees of GardaWorld were subject to Defendant BG&E's policy against harassment and discrimination given the policies statement that "all Exelon employees, contractors, and other third parties who interact with or conduct business with Exelon employees are prohibited from engaging in harassment, discrimination, or retaliation." *Id*. at p. 115-116. However, despite acknowledging being bound to Defendant policy, Mr. Ramsey did not discuss with the ethics department for Exelon any of the allegations against Mr. Roberts by either Ms. Butler or Ms. Cooper pursuant to the Defendant policy's requirement to "promptly, thoroughly and impartially investigate any alleged violations of Exelon's Code of Business Conduct." *Id*. at 118.

The hybrid test specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely. Butler at 416. Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity. *Id*. Here, although Defendant GardaWorld disbursed Plaintiff's paychecks, officially terminated her, and handled employee discipline, it did not prevent Defendant BGE from having a substantial degree of control over the circumstances of Plaintiff's employment.

**B.      There is no genuine dispute as to the material facts in support of Count I.**

According to Maryland State Government Code  §20-606(a)(1)(i,) an employer may not fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

Here, Plaintiff Cooper is a member of a protected class. On August 26, 2022, she suffered an adverse employment action when she was terminated based on an illegal and inconclusive drug test which was administered despite Mr. Ramsey not having the requisite reasonable suspicion to administer the test. Thus, such an administration of the test resulted in a disparate treatment against Plaintiff Cooper resulting in her termination. Mr. Roberts' involvement in the termination is evident based on Plaintiff Cooper  as follows.

> Q: Who was on the phone?
> A: Captain Roberts was on the phone with the rest of Engel and the rest of the team as far as the captains is concerned, like all the captains get on the phone every morning and have they, I guess, I don't know, a meeting or whatever. So he pulled me in the office that's right directly in front of mine, and told me that, you

know the two drug tests that you took yesterday? I said yeah. He was like, well, they're going to use them as positives. And I did like this, like how is that possible, they can't use a negative test as positives. He said, Engel and– I cannot think of the other name, man name– Engel and whatever the other guy name is, said that they were going to use them as positives and that , you know, basically I don't have my job anymore. So I said I'm fired? He said basically you're fired. So I walked out of the office that we two were in, I went around the corner and grabbed some of my belongings, I went outside in the BG&E hall, I smoked a cigarette, I came back in, I grabbed all my belongings and told my officer it was nice working with him and then I left." *See Exhibit 1*, 226-227.

As set forth in the Statement of Facts, Plaintiff's termination occurred less than two months from the date that Plaintiff refused to acquiesce to the sexual advances of her supervisor Mr. Roberts.

Likewise, pursuant to Maryland State Government Code §20-607, Plaintiff Cooper was subject to a discriminatory compensation practice based on the effectuated proposition by Mr. Roberts of overtime pay in exchange for sexual relations, which did in fact occur, and which which was not a proposition to any male employees of GardaWorld in exchange for the same or similar benefit. To that end, by filing in the instant suit initially in Baltimore City, Maryland, Plaintiff Cooper has satisfied Maryland State Government Code §20-1013(b) that mandates that a private civil action for employment discrimination or public accommodation discrimination must be filed in the circuit court for the county where the alleged violation occurred.

Therefore, there is no genuine dispute as to the material facts in support of Count I.

**C.    There is no genuine dispute as to the material facts in support of Count II.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B) above. Pursuant to Maryland State Government Code §20-611(1)(i), in an action alleging harassment such as the instant case, an employer is liable for the acts or omissions toward an employee or applicant for employment committed by an individual who undertakes or recommends tangible employment actions affecting the employee or an applicant for

employment, including hiring, firing, promoting, demoting, and reassigning the employee or an applicant for employment.

Here, Defendants are liable for the actions of Mr. Roberts, who engaged in a sexual relationship with his subordinate, Plaintiff Cooper, in exchange for the provision of overtime pay. Demanding and obtaining sexual favors as a condition of employment is a quintessential example of quid pro quo harassment. As the testimony above illustrates, Mr. Roberts supervised and evaluated the work of Plaintiff Cooper during the time the harassment occurred, and the harassment occurred on such a frequent basis, was physically humiliating in nature, and so severe and pervasive as to alter the condition of Plaintiff's employment and create a hostile atmosphere. Based on the foregoing testimony, the harassment was subjectively severe and pervasive as Plaintiff considered Mr. Roberts' behavior to be abusive, physically and mentally. Therefore, there is no genuine dispute as to the material facts in support of Count II.

**D.     There is no genuine dispute as to the material facts in support of Count III.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B) and (C) above. A violation of Maryland State Government Code §20-606(f) occurs when an employer, employment agency, or labor organization discriminates or retaliates against an employee or applicant for opposing unlawful employment practices, filing complaints, or assisting in investigations. To state a claim of retaliation under Md. Code, State Gov't § 20-606, a plaintiff must assert facts that establish "(1) [Plaintiff's] engagement in a protected activity; (2) adverse employment action [by Defendant]; and (3) a causal link between the two events."Within ninety days following Plaintiff's opposition to Mr. Roberts' request for sex in exchange for overtime pay, Plaintiff Cooper suffered an adverse employment action when she was terminated in August 2022. There was a causal connection between her opposition and her termination

given that her supervisor and the offender, Mr. Roberts exerted his influence over the decision to terminate Plaintiff Cooper based on an illegal and inconclusive drug test. Therefore, there is no genuine dispute as to the material facts in support of Count III.

**E.  There is no genuine dispute as to the material facts in support of Count IV.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B), (C), and (D) above. Defendants' conduct constituted disparate treatment on the basis of her sex as Plaintiff was a member of a protected class, had satisfactory work performance until her termination, and was treated differently from similarly situated male employees who did not have to be harassed or engage in sex in exchange for overtime pay. Therefore, there is no genuine dispute as to the material facts in support of Count IV.

**F.  There is no genuine dispute as to the material facts in support of Count V.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B), (C), (D), and (E) above. Mr. Roberts used his supervisory authority over the Plaintiff to increase Plaintiff's compensation in exchange for sexual intercourse, constituting quid pro quo harassment, which was objectively severe and pervasive and physically humiliating in nature, altering the conditions of Plaintiff's employment and creating an abusive and hostile atmosphere. Therefore, there is no genuine dispute as to the material facts in support of Count V.

**G.  There is no genuine dispute as to the material facts in support of Count VI.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B), (C), (D), (E), and (F) above. Plaintiff was subject to a hostile work environment as she was subjected to unwanted touches to her body, verbal sexual abuse, and physically demeaning intercourse, being so severe and pervasive so as to affect Plaintiff's terms and conditions of employment. When a supervisor is the harasser and the "harassment culminates in

29

a tangible employment action, the employer is strictly liable. <u>Vance v. Ball State Univ.</u>, 570 U.S. 421, 424, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013).  Therefore, there is no genuine dispute as to the material facts in support of Count VI.

**H.      There is no genuine dispute as to the material facts in support of Count VII.**

Plaintiff incorporates by reference as though fully stated herein all arguments set forth in Section (B), (C), (D), (E), (F), and (G) above. To establish a claim of retaliation, Complainant Cooper has shown that (1) she engaged in protected activity (refusing to engage in sexual relationship with Mr. Roberts in exchange for overtime pay), (2) her employer took an adverse employment action against her (terminating Plaintiff Cooper), and (3) there was a causal connection between the protected activity and the adverse employment action (Mr. Roberts' supervisory position over the Plaintiff and his exertion of influence over the decision to terminate Plaintiff Cooper). *See* <u>Holland v. Wash. Homes, Inc.</u>, 487 F.3d 208, 218 (4th Cir. 2007). Therefore, there is no genuine dispute as to the material facts in support of Count VII.

Respectfully submitted,

<u>Donald Huskey</u>
Donald R. Huskey (Bar No. 22981)
CPF NO. 0712010286
Law Offices of Donald R. Huskey LLC
9419 Lyonswood Drive
Owings Mills, Maryland 21117
443-929-1001
dr.huskey@gmail.com

<u>Governor Jackson, III /s/</u>
Governor Jackson, III (Bar No. 27673)
Law Office of Governor Jackson,III, LLC
400 E. Joppa Road, Suite 50
Towson, Maryland 21286
(410) 528-5150 (o)/ (410) 528-1055 (f)
gjackson@governorjacksonlaw.com
CPF #0412140364